PACIFIC SHRIMP COMPANY, Plaintiff,

v.

UNITED STATES of America, DEPARTMENT OF TRANSPORTATION,

and

Admiral Chester R. Bender, Commandant, U. S. Coast Guard, Department of Transportation, Washington, D. C., et al., Defendants.

No. C74–129S.

United States District Court, W. D. Washington.

May 2, 1974.

Martin P. Detels, Jr., Detels, Draper & Marinkovich, Seattle, Wash., for plaintiff.

Stan Pitkin, U. S. Atty., Thomas B. Russell, Asst. U. S. Atty., Seattle, Wash., William E. Gwatkin, III, Atty. in Charge, Admiralty and Shipping Section, Richard J. Beaver, Atty., Admiralty and Shipping Section, U. S. Dept. of Justice, San Francisco, Cal., for defendants.

## OPINION

BEEKS, Senior District Judge.

This case involves the future of the M/V PACIFIC SHRIMPER (Shrimper), a CI MAV 1 type of vessel (commonly referred to as a Knot ship) of 3847.12 gross tons, a registered length of 323.95 feet, and propelled by a diesel engine of 1700 horsepower. The vessel was formerly known as the REEF KNOT and was employed by Alaska Steamship Company as a regularly scheduled common carrier in the Alaska trade. Plaintiff purchased Shrimper in May, 1973 as a surplus vessel from the United States Maritime Administration for use as a processing vessel in the shrimp and crab fishery at Balboa Bay, located on the Alaska peninsula in an area adjacent to the Shumagin Islands. It is the intention of plaintiff to anchor the vessel at Balboa Bay, at which point vessels catching shrimp/crab would deliver their catches for processing into a finished marketable product, canned or frozen. The use of Shrimper would be the same as a processing plant ashore, except that the vessel would have mobility. Plaintiff, believing from past conduct of the Coast Guard with respect to the documentation and non-inspection of vessels similarly used, that it would receive like treatment, expended in excess of one million dollars in the conversion of Shrimper for use as a processing vessel, and it will be necessary to expend a further sum of approximately $200,000 in completing the conversion of Shrimper for use as a non-inspected processing vessel.

On September 5, 1973 the Officer in Charge, Marine Inspection (O.C.M.I.), 17th District, U.S. Coast Guard, at Juneau, Alaska, issued a permanent Certificate of Registry to plaintiff, the certificate reciting that her service was to be that of a "fish processor."

On September 17, 1973 the O.C.M.I., 13th District, U.S. Coast Guard, Seattle, Washington, informed plaintiff it had come to Coast Guard's attention that Shrimper was being reactivated, and that the vessel would be subject to the inspection and manning laws.[1]

Plaintiff appealed this decision to the Commander, 13th Coast Guard District, and to the Commandant of the Coast Guard, Washington, D.C., but to no avail. On January 7, 1974, the Commanding Officer, 17th Coast Guard District, by letter to plaintiff, requested the return of the Certificate of Registry stating that it had been issued in error.

This action was thereafter instituted for declaratory and injunctive relief. The court has jurisdiction[2] and the case is ripe for declaratory judgment.[3]

---

1. 46 U.S.C. § 367; 46 U.S.C. § 222.

2. 28 U.S.C. § 1331(a).

3. 28 U.S.C. § 2201; *See:* Golden v. Zwickler, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969).

■ American vessels are documented in two categories: those registered, and those enrolled and licensed. Generally, the purpose of a register is to declare the nationality of a vessel engaged in foreign trade, while the purpose of an enrollment is to evidence the national character of a vessel engaged in domestic enterprise and to enable such vessel to procure a license to engage in distinct authorized pursuits. Vessels engaged in fishing may be enrolled and licensed or registered, and all vessels, whether registered or enrolled and licensed, become vessels of the United States.[4]

■ The statutory law with respect to registering had its origin in the Act of December 31, 1792, 1 Stat. 287, and with respect to enrollment and licensing in the Act of February 18, 1793, 1 Stat. 305, both during the tenure of our first President. Surprisingly, few changes have been made in the basic law since that date, except that in 1828 [5] Congress amended the Act of February 18, 1793 to provide that vessels licensed for the mackerel fishery would be permitted to engage in the coasting trade and other fisheries.[6] The law is substantially the same today. The form of license specified by law [7] recognizes only the coasting trade, whale fishery, mackerel fishery and cod fishery. The salmon, tuna, herring, halibut, crab, and shrimp fisheries are unknown to the documentation statutes, although a vessel licensed for the mackerel fishery may lawfully engage in catching cod or fish of any other description, including shellfish.[8]

From 1884 until July 16, 1946 the documentation and inspection of vessels was performed by the Bureau of Marine Inspection and Navigation, an agency of the Department of Commerce. Thereafter until February 24, 1967, the documentation was performed by the U.S. Customs, an agency of the Treasury Department. On the last mentioned date this function was transferred to the U.S. Coast Guard, where it currently remains.

■ Generally, an enrollment and license is preferred to a Certificate of Registry because vessels under registry are subject to compulsory state pilotage acts,[9] and in some cases tonnage duties,[10] while vessels under enrollment and license are not. Although a vessel may be enrolled and licensed for the catching of any type of fish I doubt that our archaic laws make any provision for the licensing of a vessel to engage in the incidental duties of the fisheries common to Alaska, other than the actual catching of fish. As previously indicated, 46 U.S.C. § 263 authorizes a license for carrying on the mackerel fishery, thus permitting the taking of fish of every description, including shellfish, and 46 U.S.C. § 325 provides that vessels licensed for the mackerel fishery will not violate their license by catching cod or fish of any other description whatever. Except as provided in 46 U.S.C. § 404a, however, the authorization appears limited to the act of capture.

Prior to Alaska statehood [11] the salmon fishery was Alaska's principal seafood industry, the catching and processing of crab and shrimp being rather minor. Most salmon were caught in traps attached to the shore and substantially all of the processing of all species of seafood was performed in shore installations. Such operations involved diesel propelled vessels employed as cannery tenders, principally in the brailing of fish traps and in the transportation of

---

4. Anderson v. Pacific Coast Steamship Company, 225 U.S. 187, 32 S.Ct. 626, 56 L.Ed. 1047 (1912) ; R. C. Craig, Ltd. v. Ships of the Sea Incorporated, 345 F.Supp. 1066 (S. D.Ga., 1972) ; 46 U.S.C. § 251 et seq.; 46 U.S.C. § 11; 46 C.F.R. § 67.07–11, § 67.07–13, § 67.41–1.

5. Approximately 39 years before the United States acquired Alaska from Russia.

6. 4 Stat. 312.

7. 46 U.S.C. § 263.

8. 46 U.S.C. § 263 ; 46 U.S.C. § 325.

9. R.C.W. 88.16.070; Alaska Statutes § 08.-62.160, 08.62.180.

10. 46 U.S.C. § 121 et seq.

11. January 3, 1959.

fish and cannery supplies. Substantially all were under 300 gross tons.

In the years immediately following termination of World War II, numerous government owned vessels of diesel propulsion, measuring from 500 to 1500 gross tons, were declared surplus. A number were purchased by commercial packers and employed in Alaska fisheries in varying non-catching capacities.

After statehood the various fisheries underwent drastic change. Fish traps were abolished. The growth of alien fishing fleets depleted the runs of salmon. The number of shoreside processing installations was substantially reduced. The Alaska king crab industry was born and flourished. The Alaska shrimp industry is now expanding. The herring fishery is reviving. Waterborne processing is expanding, involving vessels of greater capacity.

Prior to September 5, 1973,[12] vessels engaged in Alaska fisheries, whether catching vessels or vessels performing services in connection with fisheries other than catching, were either enrolled and licensed for the mackerel fishery or registered for fishing service.

Until abolished on July 16, 1946, the Bureau of Marine Inspection and Navigation conducted the inspections of vessels required by law. Thereafter the function was transferred to the Coast Guard, which since February 24, 1967 has undertaken both documentation and inspection.

On June 20, 1936, Congress enacted 46 U.S.C. § 367 which, with certain exceptions, subjected diesel propelled seagoing vessels of 300 gross tons and over to the inspection laws. Insofar as here material the Act reads:

"Existing laws covering the inspections of steam vessels are made applicable to seagoing vessels of three hundred gross tons and over propelled in whole or in part by internal-combustion engines to such extent and upon such conditions as may be required by the regulations of the Commandant of the Coast Guard: *Provided,* That this section shall not apply to any vessel engaged in fishing, oystering, clamming, crabbing, or any other branch of the fishery or kelp or sponge industry . . ."

On July 11, 1968,[13] Congress amended the proviso to state:

"*Provided,* That this section shall not apply to any vessel engaged in fishing, oystering, clamming, crabbing, or any other branch of the fishery or kelp or sponge industry. As used herein, the phrase 'any vessel engaged in the fishing, oystering, clamming, crabbing, or any other branch of the fishery or kelp or sponge industries' includes cannery tender or fishing tender vessels of not more than five hundred gross tons used in the salmon or crab fisheries of the States of Oregon, Washington, and Alaska which are engaged exclusively in (1) the carriage of cargo to or from vessels in the fishery or a facility used or to be used in the processing or assembling of fishery products, or (2) the transportation of cannery or fishing personnel to or from operating locations. The exemption of the foregoing sentence for cannery tender or fishery tender vessels shall continue in force for five years from the effective date of this amendment."

On July 9, 1973, the termination date of the amended proviso was extended to July 11, 1978.[14]

The question here involved is whether the foregoing proviso exempts Shrimper from existing laws covering the inspections of steam vessels.

Plaintiff's argument in favor of the exemption is threefold. First, elementary fairness requires that plaintiff be granted the relief which it seeks. Second, for many years the Coast Guard and its predecessor the Bureau of Ma-

12. The date the Certificate of Registry was issued to Shrimper.

13. 82 Stat. 341.

14. 87 Stat. 150.

rine Inspection and Navigation so interpreted the statute. Third, the statute is unambiguous and a vessel engaged in any branch of the fishery is exempt.

Prior to October 20, 1973, neither the 13th nor the 17th Coast Guard Districts required inspection of diesel propelled vessels of 300 gross tons or over which were documented for fishing, irrespective of whether the vessels were to be used in the actual catching of fish.

Currently there are a number of uninspected, non-catching, diesel propelled vessels measuring from 500 to 1500 gross tons which have been documented for and are operating in Alaskan fisheries. There are also three sister ships of Shrimper operating in the fisheries, only one of which has been subjected to the inspection laws and is now an inspected vessel.[15] The M/V REEFER STAR has been documented without inspection by the 11th Coast Guard District, Terminal Island, California, as a fishing vessel (mother ship) for tuna fishing in the New Guinea area of the South Pacific. The M/V NORTHGATE was enrolled and licensed without inspection for fishing in the mackerel fishery on October 19, 1972 by the 17th Coast Guard District, and is operating in Alaska as a processing vessel, the identical use intended for Shrimper.

For a period of over thirty-seven years, the governmental agencies charged with the enforcement of the inspection laws exempted all non-catching diesel propelled vessels in excess of 300 gross tons engaged in Alaska fisheries. Whether this was, in whole or in part, because of the vessel's documentation, or of statutory interpretation, or of nonenforcement emanating from a recognition of the unique nature of Alaska fishing operations (involving many practical operating difficulties, largely

due to weather and isolation) is uncertain.

In the early years of the last decade the Coast Guard announced an intention to reverse the long-standing administrative treatment of cannery tenders and fishing tenders (non-catching vessels) and subject them to the inspection requirements. No such vessel was so subjected, but the announced intention produced action which culminated in the July 11, 1968 amendment.

■ It is true that courts will give extra authoritative weight to administrative interpretations which have been consistently followed for a long period.[16] Such an interpretation will be affirmed if it has a reasonable basis in law but courts are not obliged to rubber-stamp administrative decisions deemed inconsistent with a statutory mandate or that frustrate congressional policy.[17]

It is also true that plaintiff has been unfairly treated. Nonenforcement for substantially more than three decades, coupled with the issuance of a Certificate of Registry for Shrimper, understandably led plaintiff to believe Shrimper would be exempt from inspection. The register certified Shrimper as a vessel of the United States, entitled to the benefits and privileges appertaining thereto,[18] and the applicable statute prohibited the issuance of a Certificate of Registry until the Certificate of Inspection, if required by law, had been issued and filed.[19] Furthermore, Shrimper would not have been purchased and converted for use as a processing vessel if plaintiff had known at the time of purchase that a Certificate of Inspection would be required.

■ The government has at times been held estopped to enforce the law because of breach of the doctrine of ele-

---

15. M/V SEA ALASKA, owned by Sea Alaska Products, Inc., Certificate of Inspection issued by 13th Coast Guard District October 20, 1973.

16. Soriano v. United States, 494 F.2d 681 (9th Cir., 1974).

17. Federal Maritime Commission v. Seatrain Lines, 411 U.S. 726, 93 S.Ct. 1773, 36 L.Ed. 2d 620 (1973).

18. 46 U.S.C. § 221; 46 U.S.C. § 911(4); 19 C.F.R. § 4.96(4)(c); 46 C.F.R. § 66.03–9.

19. 46 U.S.C. § 496.

mentary fairness.[20] Estoppel may not be invoked, however, as a means of successfully avoiding the requirements of legislation enacted for the protection of the public interest.[21] An administrative agency charged with protecting the public interest, is not precluded from taking appropriate action nor can the principles of equitable estoppel be applied to deprive the public of a statute's protection because of mistaken action or lack of action on the part of public officials.[22] Laws unenforced for a long period of time do not necessarily become inoperative,[23] and the passage of time does not change the language of a statute.[24]

The purpose of 46 U.S.C. § 367, one of the federal inspection statutes, is to promote seagoing safety.[25] Safety legislation must be liberally construed,[26] and courts should not be moved by considerations of convenience or practicability to whittle away and eventually nullify their protection.[27] Exemptions from such legislation must be given a strict construction [28] and should not be enlarged by implication where made in detail.[29]

Inaction on the part of the government for more than three decades lends weight to the contention that vessels such as Shrimper were exempt from inspection. Absent the 1968 amendment such inaction would be most persuasive. I have serious doubt, however, that it is correct.

The wording of the exemption lends itself to the application of the rule of ejusdem generis. Under this rule, general words of a statute must be limited to matters of the same class or species as that which the items in the specific enumeration belong. General terms which follow specific terms are limited to matters similar to those specified.[30] Thus, the general term "branch" refers to vessels engaged in taking fish and other products of the sea similar to those named, such as shrimps, lobsters, scallops, and mussels and not to non-catching vessels employed in any fishery.

The legislative history of the original enactment does not conflict with the result reached by the application of the doctrine of ejusdem generis. In addition it supports the view that the exemption was directed at fishing vessels —vessels engaged in taking, capturing, or harvesting the enumerated as well as similar species of seafood.

The 1968 amendment [31] removes all doubt as to proper interpretation. The intent of Congress is specifically set forth in the title of the amendment as "An Act to *exempt certain vessels* engaged in the *fishing industry* from the requirements of certain laws." (Emphasis added.) The title is most significant and indicates that Congress intended far more than clarification as contended by plaintiff. If the proviso were to be given the interpretation which

20. Moser v. United States, 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1950) ; N.L.R.B. v. Atkinson, 195 F.2d 141 (9th Cir., 1952).

21. Scott Paper Co. v. Marcalus Mfg. Co., Inc., 326 U.S. 249, 257, 66 S.Ct. 101, 90 L. Ed. 47 (1945) ; United States v. Consolidated Mines & Smelting Co., Ltd., 455 F.2d 432 (9th Cir., 1971).

22. Maxwell Co. v. N.L.R.B., 414 F.2d 477, 479 (6th Cir., 1969).

23. Kelly v. Washington, 302 U.S. 1, 14, 58 S.Ct. 87, 82 L.Ed. 3 (1937).

24. Monte Vista Lodge v. Guardian Life Ins. Co. of America, 384 F.2d 126, 128 (9th Cir., 1967), cert. denied 390 U.S. 950, 88 S.Ct. 1041, 19 L.Ed.2d 1142 (1968).

25. Huron Cement Co. v. Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960).

26. Lilly v. Grand Trunk Western R. R., 317 U.S. 481, 63 S.Ct. 347, 87 L.Ed. 411 (1943).

27. United States v. Atchison T. S. F. Ry., 156 F.2d 457 (9th Cir., 1946).

28. *Id.*

29. Addison v. Holly Hill Fruit Products, 322 U.S. 607, 617, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944).

30. United States v. Alpers, 338 U.S. 680, 683, 70 S.Ct. 352, 94 L.Ed. 457 (1950) ; Federal Maritime Commission v. Seatrain Lines, *supra* note 17.

31. 82 Stat. 341.

plaintiff claims, the amendment, and in particular the time limitation, would have been unnecessary.

To adopt plaintiff's construction of the proviso would require me to hold that a cannery or fishing tender of 501 gross tons used in the salmon or crab fishery, or a vessel of 300 gross tons so used in any fishery other than salmon or crab, is subject to the inspection laws while a processing vessel, such as Shrimper, of 3847 gross tons is not. This I cannot do.

Whether vessels such as Shrimper should be exempted from the inspection laws is a matter for Congress and not for the courts.

The complaint is dismissed. This opinion shall constitute the court's findings of fact and conclusions of law pursuant to F.R.Civ.P. 52(a), and defendants may present a decree in accordance herewith.