709 F.2d 1331
 WESTERN PIONEER, INC., Marlin Fisheries, Inc., and Dolphin
Fisheries, Inc., in personam, and M/V MARLIN, her engines,
tackle, etc., and M/V DOLPHIN, her engines, tackle, etc., in
rem, Defendants-Appellants/Cross-Appellees,
v.
UNITED STATES of America, Plaintiff-Appellee/Cross-Appellant.
 No. 82-3437.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 10, 1983.
Decided July 8, 1983.
 
 Warren A. Schneider, Dept. of Justice, Washington, D.C., for plaintiff-appellee/cross-appellant.
 John H. Bradbury, Bradbury, Bliss & Riordan, Anchorage, Alaska, for defendants-appellants/cross-appellees.
 On Appeal from the United States District Court for the District of alaska.
 Before WALLACE, ANDERSON, and SCHROEDER, Circuit Judges.
 J. BLAINE ANDERSON, Circuit Judge:
 
 
 1
 In this action we are called upon to interpret certain United States shipping laws. Three of Western Pioneer's vessels were cited or threatened with citation for violations of 46 U.S.C. Secs. 367, 404, 672, and 673, dealing with inspection of vessels and qualification of crew members.[1] Western Pioneer's defense was based on exemptions from those statutes for "cannery tender" and "fishing tender" vessels. The Coast Guard and the district court characterized Western Pioneer's operations as falling outside the tender vessel exemptions. We affirm.
 
 I. FACTS
 
 2
 Western Pioneer is a Washington corporation that operates a fleet of five vessels between ports in Washington and Alaska. On voyages south and east from Alaska, the vessels carry frozen and canned crab and salmon from Alaska processors to Seattle, Washington, or to points in Alaska where the product can be transferred to other carriers. On northbound voyages the vessels carry a variety of supplies and durable goods destined for fishery processors and the residents of villages and communities in Western Alaska, the Alaska Peninsula, and the Aleutian Islands.
 
 
 3
 All of Western Pioneer's vessels are former U.S. Navy yard oilers; Western Pioneer has expended considerable efforts and funds to convert them into "cannery tenders" or "fishing tenders." Western Pioneer's purpose in seeking to qualify its vessels as tenders has been to take advantage of exemptions from statutes that would otherwise closely regulate their operations. Two of the exemptions are contained in identical provisos of 46 U.S.C. Secs. 367 and 404, and exclude from those statutes' requirements
 
 
 4
 cannery tender or fishing tender vessels of not more than 500 gross tons used in the salmon or crab fisheries of the States of Oregon, Washington, and Alaska which are engaged exclusively in (1) the carriage of cargo to or from vessels in the fishery or a facility used or to be used in the processing or assembling of fishery products ....
 
 
 5
 Tender vessels, which are registered as "fishing vessels," have also historically been exempt from 46 U.S.C. Secs. 672 and 673, which apply by definition only to "merchant vessels."
 
 
 6
 There is no dispute that the physical rigging and outfitting of Western Pioneer's vessels brings them within the literal statutory requirements for tenders. They are all registered as fishing vessels. Moreover, during conversion of the vessels from yard oilers, their weight was deliberately kept within 500 gross tons to meet the weight limitations of Secs. 367 and 404. Western Pioneer also takes great pains to ensure that its cargo is closely connected to fishing vessels or facilities. Although the company does not publish schedules nor issue tariffs, it circulates vessel departure notices to interested parties. The notices expressly state that all cargo carried must be destined for or originate from fishery vessels or facilities. Shippers wishing to send cargo to Alaska deliver their goods to Western Pioneer's loading facilities in Washington, where the cargo is inspected to ensure that it is consigned directly to a fishing vessel or facility. Western Pioneer's longshoremen are also instructed not to load cargo unless it meets that qualification.
 
 
 7
 On separate occasions in 1977, two of Western Pioneer's vessels, the Marlin and the Dolphin, were boarded by the Coast Guard and cited for a long list of safety violations. Pertinent to this appeal are Western Pioneer's citations for violating 42 U.S.C. Secs. 367 and 404 (requiring vessels carrying freight for hire to have a certificate of inspection), and 42 U.S.C. Sec. 672(i) (requiring certification of seamen on merchant vessels). In the ensuing administrative proceedings, Western Pioneer defended on the ground its vessels were tenders and therefore exempt from the safety statutes. The hearing officer rejected Western Pioneer's defense and imposed $70,610 in penalties. On appeal to the Commandant of the Coast Guard, some charges were modified and the fine reduced to $68,950. The Commandant affirmed, however, the hearing examiner's holding that Western Pioneer's vessels were not exempt from the statutes.
 
 
 8
 The Commandant noted that the tender vessel exemptions in 46 U.S.C. Secs. 367 and 404 cover vessels "engaged exclusively in the carriage of cargo to or from vessels in the fishery or a [processing] facility." The parties stipulated that "cargo" referred only to "fisheries related cargo," and that "fisheries related cargo" meant "all goods utilized by and reasonably related to the fisheries industry as defined above or which are necessary or appropriate to the support of personnel directly engaged in the fisheries industry and which are consigned directly to a fishing vessel or fish processing facility."
 
 
 9
 The Commandant then focused on the nature of Western Pioneer's cargo and the parties to whom it was ultimately destined. Aboard the Marlin and Dolphin the Coast Guard had found a wide variety of durable goods, including liquor and beer for liquor stores, motorcycles for a general store, and building materials, equipment, and parts for local governments and construction companies. The Commandant determined that much of Western Pioneer's cargo was not fisheries related, and stated:
 
 
 10
 The unequivocal purpose of the tender exemption is to provide relief to a dedicated segment of the Northwest fishing industry, not to give relief to vessels such as the MARLIN, transporting general cargo, destined for other than the fishing industry, which incidentally is discharged at facilities primarily used to handle fishery products.
 
 
 11
 Because they were not engaged exclusively in carrying fisheries related cargo, Western Pioneer's vessels did not qualify for that exemption.
 
 
 12
 As to 46 U.S.C. Sec. 672(i), the Commandant noted that section applied only to merchant vessels. Although Western Pioneer's vessels were registered as fishing vessels, the Commandant referred to the Coast Guard's "consistent interpretation" that " 'merchant vessels' embraces all vessels engaged in trade or commerce and is not restricted to vessels carrying passengers or freight for hire." Since the Marlin and Dolphin were cargo carriers engaged in trade or commerce, they were merchant vessels regardless of their registry.
 
 
 13
 The United States filed the present action on October 10, 1979 to enforce the Coast Guard assessment. In March 1981, after cross-motions for summary judgment had been fully briefed, the Coast Guard boarded another Western Pioneer vessel, the Bowfin. The Coast Guard determined the Bowfin was not in compliance with the three-watch system requirement of 46 U.S.C. Sec. 673 or the 65% able-bodied seamen requirement of 46 U.S.C. Sec. 672(a). It also ordered Western Pioneer to modify its certificates of registry to show their service as "freight" instead of "fishing."
 
 
 14
 Western Pioneer responded by amending its answer to include a counterclaim for a declaratory judgment that its vessels were properly registered as fishing vessels and thus exempt from Secs. 672 and 673. It also moved for a preliminary injunction against enforcement of the statutes. After a hearing on the motion, the parties stipulated that judicial proceedings and Coast Guard enforcement would be suspended for four months, during which time Western Pioneer would modify its operating procedures and the government would file an amended complaint. The government's amended complaint alleged that Western Pioneer's vessels engaged in a regular freight service and were not covered by the statutory exemptions, and that they were improperly registered as fishing vessels.
 
 
 15
 The district court issued its memorandum and order in July 1982. It first held that the Coast Guard's interpretation of the relevant statutes and regulations was entitled to judicial deference unless it was unreasonable or a clear error of judgment. After reviewing the historical underpinnings of the tender exemptions, the court concluded that in light of the Coast Guard's expertise and the established policy of strictly construing exceptions to safety legislation, the Coast Guard's interpretation of the exemptions was reasonable. Western Pioneer filed a timely appeal.
 
 II. STANDARD OF REVIEW
 
 16
 There are two parts to this appeal. First, we must review the district court's decision upholding the penalties against Western Pioneer. Resolution of that issue turns on whether Western Pioneer operates tender vessels and thus is exempt from 46 U.S.C. Secs. 367, 404, and 672(i). Second, we must review the district court's declaration that Western Pioneer's operations in general are not exempt from 46 U.S.C. Secs. 672 and 673. Resolution of that issue turns on whether Western Pioneer's vessels are merchant vessels.
 
 
 17
 Our standard of review over these questions of statutory interpretation is identical to the district court's. See Committee for an Independent P-I v. Hearst Corp., 704 F.2d 467, 472 (9th Cir.1983) ("[B]eing limited to the agency record, the district court is in no better position to review agency action than the appellate court."). The Administrative Procedure Act mandates that the reviewing court decide all relevant questions of law [and] interpret constitutional and statutory provisions ...." 5 U.S.C. Sec. 706. We must nonetheless give due deference to the interpretation of statutes and regulations by the agency charged with their administration. Loma Linda University v. Schweiker, 705 F.2d 1123, 1126 (9th Cir.1983); Committee for an Independent P-I, 704 F.2d at 472. Our task, then, is not to interpret the statutes as we think best, but rather to inquire whether the Coast Guard's construction was "sufficiently reasonable" to be accepted. FEC v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23, 34 (1981). "To satisfy the standard it is not necessary for a court to find that the agency's construction was the only reasonable one or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." Id.
 
 
 18
 Western Pioneer argues the Coast Guard's interpretation is not entitled to such deference for several reasons, none of which we find persuasive. First, Western Pioneer notes the interpretation was not embodied in a regulation, and argues it thus afforded operators no standards by which to assess proscribed cargo. We address the due process component of this argument below. At this juncture, the Coast Guard's failure to promulgate regulations is considered solely as an argument against deference. The Supreme Court has indicated that deference is appropriate whether administrative constructions of a statute are reached by adjudication or rulemaking. FEC v. Democratic Senatorial Campaign Comm., 454 U.S. at 32, 102 S.Ct. at 42, 70 L.Ed.2d at 30.
 
 
 19
 Western Pioneer also argues the Coast Guard's statutory interpretation is not entitled to deference because the Coast Guard has no expertise regarding the Alaskan fishing industry. We have rejected such arguments before, and we do so again. See Committee for an Independent P-I, 704 F.2d at 472; Doyon, Ltd. v. Bristol Bay Native Corp., 569 F.2d 491, 497 (9th Cir.), cert. denied, 439 U.S. 954, 99 S.Ct. 352, 58 L.Ed.2d 345 (1978).
 
 
 20
 Western Pioneer's third argument regarding deference is that the Coast Guard should not be permitted to expand its jurisdiction by means of statutory interpretation. We do not believe the Coast Guard has done so. Congress has given the Coast Guard power to enforce "all applicable federal laws on and under the high seas" and to "promulgate and enforce regulations for the promotion of safety." 14 U.S.C. Sec. 2. The statutes at issue here are clearly safety statutes within the Coast Guard's power to administer and enforce. This court has previously held, in a case involving 46 U.S.C. Secs. 672 and 673, that the Coast Guard's interpretation is entitled to deference. United States v. Blue Water Marine Industries, Inc., 661 F.2d 793 (9th Cir.1981).
 
 
 21
 Finally, Western Pioneer argues against deference on the ground the Coast Guard's prior interpretation of the relevant statutes is inconsistent with its present interpretation. We agree with Western Pioneer's statement of the law, see United States v. Leslie Salt Company, 350 U.S. 383, 396, 77 S.Ct. 416, 423, 100 L.Ed. 441, 451 (1956); Power Brake Co. v. United States, 427 F.2d 163, 164 (9th Cir.1970), but we do not see the Coast Guard's current interpretation as inconsistent. The Coast Guard has always considered Western Pioneer's vessels to be tenders so long as they carried "directly fisheries related" cargo. That interpretation persists; however, on the voyages in question in this action Western Pioneer vessels were carrying cargo deemed to be non-fisheries related.
 
 
 22
 Moreover, the Coast Guard presented evidence of early enforcement efforts in the form of a 1978 National Transportation Safety Board decision involving the Marlin and Secs. 367 and 404. In that proceeding the Coast Guard sought revocation of the merchant mariner's license of Amigo Soriano, president of the company that owned the Marlin. The Coast Guard revoked Soriano's license for willfully ordering the Marlin to carry non-fishery related freight for hire in violation of 46 U.S.C. Secs. 367 and 404. The NTSB agreed with the Coast Guard that the Marlin did not qualify for the tender vessel exemption because a substantial portion of her cargo was not fishery related and was consigned to non-fishery consignees.[2] The incident is useful for our consideration because it rebuts Western Pioneer's claim of a recent change in the Coast Guard's interpretation of Secs. 367 and 404.
 
 
 23
 Having considered Western Pioneer's arguments against deference and found them to be without merit, we focus our attention on the reasonableness of the Coast Guard's construction of the relevant statutes.
 
 III. THE PENALTY ISSUE
 A. 42 U.S.C. Secs. 367 and 404
 
 24
 Sections 367 and 404 require most commercial seagoing vessels to carry a certificate of inspection and to be periodically inspected to ensure compliance with numerous statutes and regulations. Tender vessels are exempt from this pervasive regulatory scheme. To understand why, a brief background of the Alaskan fishing industry and the role of tenders within it is necessary.
 
 
 25
 Western Alaska is a vast, remote, sparsely populated area whose inhabitants are dependent on the fisheries for their livelihood. Until the 1940's, the principal activity in these areas was salmon fishing, which took place during a narrowly defined season. In the late 1940's and early 1950's, the industry expanded to include year-round halibut fishing and crab catching. As a result, small permanent communities grew up around the fishing ports and processing plants.
 
 
 26
 When the only activity in the area was seasonal salmon fishing, the fishermen and those who worked at the processing plants were supplied exclusively by "tender vessels" operated by the processors. The tenders hauled supplies, including fishing nets and other equipment, spare parts, fuel, food, and other cargo to the fishermen and workers and returned loaded with fish. In some communities the processor or cannery operated a community commissary whose stores were stocked by the same tender vessels.
 
 
 27
 With the development of year-round industry and permanent communities, the commissaries became privately owned, and other stores, bars, and other independent service facilities developed. The processors began to contract out the tendering operations. Western Pioneer is the successor to a number of smaller independent operators of tender vessels and is presently the single provider of tendering services in Western Alaska.
 
 
 28
 Until the early 1960's, the governmental agencies charged with enforcing the inspection laws simply did not enforce them against tenders. The reason for the nonenforcement is not altogether clear, but it was a result, at least in part, of the vessels' documentation, of the agencies' statutory interpretation, and of a recognition of the unique nature of Western Alaska fishing operations. In the early 1960's, the Coast Guard announced its intention to reverse the long-standing administrative treatment of tender vessels and subject them to inspection requirements. That announcement led to the passage in 1968 of the statutory exemptions contained in 42 U.S.C. Secs. 367 and 404. See Pacific Shrimp Co. v. United States, 375 F.Supp. 1036, 1041 (W.D.Wash.1974). The exemptions' original 1973 termination date has thrice been extended until it now stands at January 1, 1988.
 
 
 29
 Although all of the cargo carried to Western Alaska ports by Western Pioneer's vessels is delivered directly to fishing vessels and fishery facilities, the cargo may be ultimately destined for anyone living in an adjacent village or town. Many items carried by Western Pioneer are for the personal use of those employed by canneries and processors and for others residing within communities close by or adjacent to fishery processors. Thus, the issue is whether cargo whose ultimate user is not a fishing vessel or facility but which will be used within a community that has developed around a fishery is "directly fishery related."
 
 
 30
 Congress' purpose in exempting tenders is evidenced by the House Report accompanying passage of the exemptions. It states in part:
 
 
 31
 In general, requirements of the Coast Guard with respect to fishing vessel standards have been less rigorous than those applied to strictly commercial vessels engaged in the carriage of cargo. For a number of years, the Coast Guard afforded the same treatment to cannery tender and tank vessels used for the transportation of fishing gear and fuel in connection with catching and canning of fish.
 
 
 32
 Recently, the Coast Guard has indicated that it believes that the auxiliary vessels engaged solely in transportation should not be extended the same leniency as the vessels actually engaged in the fishery. If the regulations are applied in their strictest form, it will seriously handicap our fisheries, since neither economic nor physical conditions warrant the use of other than the present type of vessels in the trade. These vessels are used for relatively short periods each year in connection with fishing runs and it would be completely uneconomical to demand that fully inspected vessels meeting all Coast Guard regulations be utilized for this service.
 
 
 33
 H.R.Rep. No. 1399, 90th Cong., 2d Sess. 1, reprinted in 1968 U.S.Code Cong. & Ad.News 2598.
 
 
 34
 The foregoing legislative history suggests that Congress viewed tenders as distinctive vessels with a very narrow purpose, operating "for relatively short periods each year in connection with the fishing runs" and transporting "fishing gear and fuel in connection with catching and canning of fish." Although Western Pioneer's vessels may be descendants of the unique vessels Congress intended to protect through the 1968 exemptions, their role has clearly expanded. Western Pioneer operates a fleet of independently owned vessels that will carry any item, to any customer, so long as the customer picks up the item at the "fishery vessel or facility" to which it was consigned. With the growth and development of the remote fishing villages and communities in Western Alaska has come a desire for goods and services only indirectly related to the fisheries. The connection is, in many instances, so tenuous that it consists merely of a storekeeper taking delivery of items of general merchandise from a fishery dock to be sold to family members of a cannery employee. While we understand Western Pioneer's argument that virtually everything in this remote region is dependent for support on the fisheries, we do not see as unreasonable the Coast Guard's interpretation that Western Pioneer's operations have evolved to a point beyond which Congress intended to exempt. This is particularly true because, as the district court reasoned, the statutes at issue here are safety legislation, exemptions to which must be strictly construed. See United States v. Blue Water Marine Industries, Inc., 661 F.2d 793, 796 (9th Cir.1981); Pacific Shrimp Co. v. United States, 375 F.Supp. 1036, 1042 (W.D.Wash.1974).
 
 B. 42 U.S.C. Sec. 672(i)
 
 35
 The Coast Guard's enforcement of Sec. 672(i) against Western Pioneer raises the issue whether Western Pioneer's vessels were "merchant vessels" during the voyages on which they were cited. Our conclusion regarding Secs. 367 and 404 dictates the result here. Since the Marlin and Dolphin were not tenders on the voyages in question, they were necessarily merchant vessels. There is nothing unreasonable about the Coast Guard's interpretation of "merchant vessel" as encompassing Western Pioneer's cargo-carrying operations. In the interest of narrowly construing exceptions to safety legislation, this court has interpreted the term "merchant vessels" much more broadly than we do here. See United States v. Blue Water Marine Industries, Inc., 661 F.2d 793 (9th Cir.1981) (holding scientific research vessels to be merchant vessels).
 
 
 36
 Western Pioneer's argument against merchant vessel status derives from the Coast Guard's repeated certification of Western Pioneer's vessels as fishing vessels. But certification is based on the documentation prepared by a vessel owner, not an independent investigation as to the operation or condition of the vessels. Nothing in the statutes or regulations suggests that registration of a cargo-carrying vessel as a "fishing vessel" precludes treatment of it as a "merchant vessel" for purposes of Sec. 672(i).
 
 IV. THE DECLARATORY RELIEF ISSUE
 
 37
 Except for the violation of 42 U.S.C. Sec. 672(i) discussed above, none of Western Pioneer's vessels were formally charged with violating the "manning" statutes, 46 U.S.C. Secs. 672 and 673, pertaining to all merchant vessels. The statutes are only in issue because on May 19, 1981, when it boarded the Bowfin, the Coast Guard notified Western Pioneer of its intention to enforce the statutes in the future. Western Pioneer sought declaratory relief from the statutes, which was denied by the district court.
 
 
 38
 We affirm the district court's denial of declaratory relief, but we want to make clear the limited nature of our holding. As mentioned above, the Coast Guard stipulated that Western Pioneer's vessels are properly characterized as tenders so long as they carry "directly fisheries related" cargo. Because we have decided the Marlin and Dolphin were not carrying "directly fisheries related" cargo on the voyages in question, they were not tenders on those voyages. For the reasons expressed in our discussion of Sec. 672(i), we affirm the denial of declaratory judgment to the extent it declares that when Western Pioneer's vessels are not operating as tenders, they are subject to all the requirements of Secs. 672 and 673 pertaining to merchant vessels. We are not prepared to say, however, that when Western Pioneer properly operates a tender service it must conform to Secs. 672 and 673. We do not read the district court's order as having decided that question, and we likewise do not feel the need to decide it on this record.[3]V. ESTOPPEL
 
 
 39
 According to Western Pioneer, the Coast Guard should be estopped from enforcing the inspection and manning statutes because Western Pioneer has spent large sums converting its vessels in specific reliance on the 1968 tender exemptions, and has operated for several years without challenge by the Coast Guard. While we recognize that estoppel is an appropriate defense against the government in certain limited circumstances, see, e.g., Johnson v. Williford, 682 F.2d 868 (9th Cir.1982), we do not view this as a proper case for estoppel because Western Pioneer's reliance was unjustified. See Northern Life Insurance Co. v. United States, 685 F.2d 277, 279 (9th Cir.1982) (requiring "reasonable" reliance).
 
 
 40
 Western Pioneer has been in business only since 1972, and from 1972-1975 it operated a single vessel, the 188-ton Dawson, which it registered for "fishing and freight." In October 1975 the 483-ton Marlin commenced service. The Coast Guard first attempted to enforce the inspection statutes against the Marlin three months later in January 1976, when it initiated the license revocation proceedings discussed above. In those proceedings both the Coast Guard Commandant and the National Transportation Safety Board agreed with the Coast Guard's construction of the tender vessel exemption.
 
 
 41
 Although on that occasion the Coast Guard did not attempt to enforce the manning statutes (it did one year later when it boarded the Marlin and Dolphin and initiated these proceedings), Western Pioneer should have been on notice that it could not reasonably rely on Coast Guard nonenforcement. If it proceeded to purchase and convert vessels in reliance on the tender vessel exemptions, it did so at its own risk.
 
 VI. DUE PROCESS
 
 42
 Western Pioneer cites several cases holding that due process may require an agency to promulgate regulations and rules of procedure governing the exercise of its discretion. E.g., White v. Roughton, 530 F.2d 750, 753-54 (7th Cir.1976); Holmes v. New York City Housing Authority, 398 F.2d 262, 264-65 (2d Cir.1978). Those cases are not on point, because enforcement of the inspection and manning statutes at issue here are not a matter requiring the exercise of discretion. See District II, Marine Engineers Beneficial Association v. Adams, 447 F.Supp. 72, 80-81 (N.D.Ohio 1977).
 
 
 43
 We are not unsympathetic to Western Pioneer's argument because we foresee incessant litigation under the Coast Guard's current approach. The Coast Guard has stipulated that Western Pioneer properly operates a tender service whenever its vessels "are engaged in the carriage of cargo which is directly fisheries related." Unfortunately, the parties cannot agree on a list of items that are directly fisheries related. It will be highly burdensome for both parties if the Coast Guard has to board Western Pioneer's vessels on every voyage to inspect their cargo. Without a set of published guidelines on the allowable cargo of tenders, repeated boardings and item-by-item inspections will likely be the result. Although we discourage such inefficient administrative practice, the Coast Guard's failure to promulgate guidelines does not rise to the level of a due process violation.
 
 Judgment of the district court is
 
 44
 AFFIRMED.
 
 
 
 [1]
 The Coast Guard also cited the vessels for violations of other statutes, but this appeal involves only the construction of the four statutes cited in text. Western Pioneer stipulated that 46 U.S.C. Sec. 224a (improperly certified officers) and 46 U.S.C. Secs. 170(7) (noncompliance with hazardous cargo regulations) were applicable to its vessels; the applicability of 46 U.S.C. Sec. 88 (requiring a loadline assignment) was resolved below in Western Pioneer's favor; and Western Pioneer apparently never disputed the application of 33 U.S.C. Sec. 1604 (requiring a fog signal)
 The Coast Guard initially appealed the district court's construction of 46 U.S.C. Sec. 88, but has now abandoned that argument.
 
 
 [2]
 The NTSB found, however, that the violation was not committed under authority of Soriano's license and ordered it reinstated
 
 
 [3]
 The Coast Guard's position regarding whether it views tenders as merchant vessels is unclear. At places it seems to argue that tenders may simultaneously be merchant vessels, but it has never subjected them to the manning statutes in the past. Moreover, when it boarded the Bowfin, the Coast Guard issued no citations for violations of the inspection or manning statutes. It apparently viewed the Bowfin's cargo as "directly fisheries related," because it stipulated that the cargo aboard the Bowfin at that time was "destined for use" by a fishing vessel or facility. Therefore, we interpret the Coast Guard's position as conceding the Bowfin was a properly operating tender vessel on March 19, 1981, and, as such, was exempt from 46 U.S.C. Secs. 367, 404, 672, and 673