**ALEKNAGIK NATIVES, LTD., et al., Plaintiffs,**

**v.**

**UNITED STATES of America, et al., Defendants.**

**No. A 77–200 Civil.**

United States District Court,
D. Alaska.

March 19, 1985.

Submitted for Publication May 30, 1986.

James F. Vollintine, Anchorage, Alaska, for plaintiffs.

Michael Spaan, U.S. Atty., Deborah Smith, Asst. U.S. Atty., Anchorage, Alaska, for federal defendants.

Monte Engle, Donald Cooper, Anchorage, Alaska, for intervenors English Bay Village Council and Port Graham Village Council.

Joe P. Josephson, James N. Reeves, Anchorage, Alaska, for assorted non-federal defendants.

Rolfe Watson, Conway, Massachusetts, Basil Atkinson, Ekwok, Alaska, in pro. per.

## OPINION

FITZGERALD, Chief Judge.

In 1891 and 1926, Congress extended the operation of the federal townsite laws to Alaska, including the Territory's Native people, "[u]ntil [it] otherwise ordered." 26 Stat. 1099, 43 U.S.C. § 732 (repealed 1976); 44 Stat. 629, 43 U.S.C. §§ 733–736 (repealed 1976). The present action raises issues having to do with the impact of two recent congressional enactments, the Alaska Native Claims Settlement Act of 1971 (ANCSA), 43 U.S.C. §§ 1601–1628, and the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701–1782, upon the continued operation and administration of the townsite laws in Alaska. This court must now determine whether ANCSA or FLPMA terminated or modified the operation of the townsite laws on lands that had been "segregated" for townsite locations and for which subdivisional surveys had been requested *prior* to the enactment of ANCSA and FLPMA, but which had not yet been occupied or subdivided until *after* the legislation became effective.

The plaintiffs, three native village corporations organized under the provisions of ANCSA and the village and municipal councils for those villages, contend that ANCSA terminated the operation of the townsite laws on all townsite lands that were vacant and unsubdivided at the time of ANCSA's passage in 1971. They suggest that the Secretary of the Interior erred when he failed to withdraw these lands from further occupancy under the townsite laws, but instead permitted both native and non-native individuals to initiate claims on these lands under the townsite laws.

The intervenors, who are the traditional village councils of two unincorporated native villages, contend that ANCSA did not terminate or alter the applicability of the federal townsite laws on vacant and unsubdivided townsite lands, and agree with the Secretary's interpretation of ANCSA's effect on the administration of townsite lands. However, the intervenors contend that the Secretary erred following the enactment of FLPMA in 1976, when he interpreted FLPMA to foreclose any new entries under the townsite laws on townsite lands which were then vacant and unsubdivided.

The Secretary has applied ANCSA as not altering the operation of the townsite laws on lands that had been previously segregated for townsites. However, he has interpreted FLPMA to foreclose any new entries under the townsite laws after 1976. All parties have moved for summary judgment. Because I find the Secretary's interpretation of the statutes to be reasonable, I grant summary judgment in favor of the federal defendants against both the plaintiffs and the intervenors.

## THE STATUTES

1. *Federal Townsite Acts and Regulations*

In the Townsite Act of March 3, 1891, 26 Stat. 1099, 43 U.S.C. § 732 (repealed 1976), Congress extended the federal townsite laws to Alaska. It provided that the Secretary of the Interior could designate one or more townsite trustees, who would be authorized to "enter" public lands in various parts of Alaska "for town-site purposes," in compliance with the federal townsite laws, *see* 43 U.S.C. § 718 (repealed), and who could set aside those lands "for the several use and benefit of the[ir] occupants." 26 Stat. 1099. Congress also directed the Secretary to promulgate regulations under which trusts could be executed "in favor of the inhabitants of [each] town site," the lands in each townsite could then be surveyed into lots, and the vacant lots sold, with the proceeds going to the trust. 26 Stat. 1099–1100.

In the Alaska Native Townsite Act (ANTA) of May 25, 1926, 44 Stat. 629, 43 U.S.C. §§ 733–736 (repealed 1976), Congress specifically authorized the extension

of the townsite laws and the issuance of townsite deeds to Alaskan natives. *See* S.Rep. No. 793, 69th Cong., 1st Sess. 1–2 (1926). Congress provided that title to any lands conveyed to natives under the townsite laws would be inalienable, except as specifically approved by the Secretary, and that such lands would not be subject to taxation, seizure for nonpayment of debts, or adverse possession. 44 Stat. 629. In 1948, Congress authorized the townsite trustees to issue deeds to natives under the townsite laws that were unrestricted "as to sale, encumbrance, or taxation" (but not as to seizure for nonpayment of debts, other than obligations to the federal government), if the Secretary found that the individual native was "competent to manage his own affairs" and if the native specifically petitioned for an unrestricted deed. 62 Stat. 35, 43 U.S.C. § 737; 43 CFR §§ 2564.-6–2564.7.

The Secretary promulgated detailed regulations implementing the statutes and establishing procedures for entering upon and obtaining title to public lands under the townsite laws in Alaska. Occupants taking up lands in a proposed townsite were required to apply to the Bureau of Land Management (BLM) for a survey of the exterior boundaries of the townsite. However, excluded from the proposed townsite were those lands required for government purposes and any claims relating back to Russian occupancy. The exterior boundary

survey was performed at government expense. 43 CFR § 2565.1(a); *See* Memorandum of December 7, 1976 from Regional Solicitor John M. Allen to Townsite Trustee at 4 (indicating that procedures required under 43 CFR § 2565 for "Non-Native Townsites" in Alaska also apply to native townsites). Once the survey of the townsite's exterior boundaries had been approved by the Secretary, a majority of its occupants had to petition the Secretary for appointment of a townsite trustee and for survey of the townsite's interior "into lots, blocks, and municipal reservations for public use." [1] 43 CFR § 2565.1(b). The filing of this petition was noted on the public land records, and the Secretary has held that it operated to *"segregate* the land from further disposal under the public land laws." Memorandum of Feb. 20, 1979 from Regional Solicitor John M. Allen to Townsite Trustee at 2–3 [hereinafter cited as Allen Memorandum]; Affidavit of George Gustafson at 2, November 19, 1982 (emphasis in original) [hereinafter cited as Gustafson Affidavit]; *see* 43 CFR § 2091.4. After the petition was filed, the Secretary designated a trustee,[2] who filed any necessary applications and proof of occupancy for the lands in the townsite, collected any required purchase prices from the inhabitants, and then made formal entry of the townsite.[3] 43 CFR §§ 2565.1(c)–2565.2; Gustafson Affidavit, *supra* at 2.

---

**1.** In his affidavit of November 19, 1972, defendant George Gustafson, the townsite trustee for all of Alaska, suggests that the exterior boundary survey may often be performed *after* the occupants of the proposed townsite have filed their initial petition with the Secretary. Gustafson Affidavit, at 2. This practice appears to diverge slightly from the prescribed order provided in the Secretary's regulations, *see* 43 C.F.R. § 2565.1, but the difference is insignificant and does not affect the outcome of this litigation.

**2.** Since at least 1961, the Secretary has designated a federal employee working at the BLM as the townsite trustee for all of Alaska. At one time local officials were designated as townsite trustees in Alaska, consistent with the practice in many other western states. *See* Gustafson Affidavit, *supra,* at 1.

**3.** The Secretary's regulations indicate that no formal proof of occupancy, purchase price, or any other fees are required for lands entered "as a native town or village under [ANTA] section 3." 43 C.F.R. § 2564.2. In practice, however, the Secretary appears to require non-native occupants of these townsites to purchase their lots and to pay a pro rata share of the survey costs and other administrative expenses. *See* Allen Memorandum, *supra,* at 2; 43 C.F.R. § 2564.3. Moreover, George Gustafson's affidavit appears to indicate that formal entry by the townsite trustee occurs *after* subdivisional survey of the townsite, whereas the Secretary's regulations suggest otherwise. *See* C.F.R. § 2565.3. Again, neither of these apparent discrepancies has any bearing on the resolution of this lawsuit.

Following these steps, those areas of the townsite that were occupied were "subdivided by the United States into blocks, lots, streets, alleys, and municipal public reservations," with the expense of this subdivisional survey borne through lot-by-lot assessment.[4]  43 CFR § 2565.3(a)–(b).  The other areas of the townsite remained unsubdivided until they were subsequently occupied.  Gustafson Affidavit, *supra*, at 2.  Once the plat of each subdivisional survey was approved by the BLM, the Secretary issued a patent for the lands included in the survey to the trustee, who in turn issued deeds to all occupants who had fully paid any purchase price and assessments required for their lots.  43 CFR §§ 2565.-3(c)–2565.4.  Non-natives received unrestricted deeds for their lots, making them freely alienable, taxable, and subject to seizure for non-payment of debts and to adverse possession, whereas natives could either obtain unrestricted or restricted deeds (under which their lots would not be freely alienable or subject to taxes or seizure), depending upon their requests and the Secretary's determinations concerning their "competen[ce] to manage [their] own affairs."  43 CFR §§ 2564.4, 2564.6–2564.7.

The date that each particular subdivisional survey was approved represented a cutoff date for new occupancy claims on the lands contained in that survey: no individual could begin occupying any of these lands under the townsite laws after that date.[5]  43 CFR § 2565.3(c).  Once each subdivisional survey had been completed, all lots within that survey that remained unoccupied and unclaimed could be sold by the trustee at a public sale.[6]  43 CFR § 2564.5.  The trustee and the Secretary could use any proceeds from selling these lots to make public improvements in the townsite;

if the inhabitants had already formed a municipal corporation, all proceeds were turned over to the municipality "for [its] use and benefit," and all lots that had not been sold were deeded to the municipality.  43 CFR § 2565.7;  Allen Memorandum, *supra*, at 2.  When all lands in the original townsite had been progressively subdivided and distributed in this manner, the townsite trust was terminated.

## 2.  *ANCSA's Impact on the Administration of Townsites*

On December 18, 1971, Congress enacted ANCSA and authorized the conveyance of approximately 44 million acres to Alaska native corporations.  In order to provide native village corporations with an opportunity to acquire lands in the vicinity of their villages, ANCSA Section 11(a)(1) withdrew all public lands surrounding native villages "from all forms of appropriation under the public land laws," except for those lands already *"subject to valid existing rights."*  43 U.S.C. § 1610(a)(1) (emphasis added).  ANCSA section 12(a)(1) gave village corporations three years from the passage of the act to select lands out of these withdrawn areas.  43 U.S.C. § 1611(a)(1).

In administering the ANCSA land selection process, the Secretary was required to determine whether ANCSA's land withdrawal provisions applied to lands that had been "segregated" as townsites prior to ANCSA's enactment based upon the filing of petitions by their occupants for appointment of townsite trustees and subdivisional survey, but which had not yet been fully distributed under the townsite laws.  On June 30, 1972, the Director of the BLM issued an unpublished memorandum which concluded that as long as a group of occu-

---

4.  As noted above, these lot-by-lot assessments would appear not to be imposed upon lands occupied by natives which were entered as a native village under ANTA section 3.  43 C.F.R. § 21564.2.

5.  George Gustafson's affidavit reveals that this deadline was not enforced against native occupants between 1959 and 1976.  Gustafson Affidavit, *supra*, at 2.

6.  Under a February 8, 1977 opinion of the Regional Solicitor, if the occupants of a townsite have already formed a municipal corporation, the municipality is empowered to veto any proposed public sale of unclaimed lots by the trustee, because under the Secretary's regulations, any proceeds of such a public sale would be paid to the municipality anyway.  *See* Allen Memorandum, *supra*, at 2 & n. 4.

pants had filed their petition prior to ANCSA's enactment, the lands in their townsite were "subject to valid existing rights" under the terms of ANCSA section 11(a)(1), and therefore had not been withdrawn by ANCSA from further distribution under the townsite laws.[7] The Acting Secretary of the Interior approved this memorandum on July 13, 1972, and its contents were made widely known to native corporations selecting lands under ANCSA. Affidavit of Neil Bassett, Chief of Division of Resources, BLM State Branch of Lands and Mineral Management, at 2, November 18, 1982.

In relevant part the memorandum provides:

> The application for survey as a townsite, when filed, is considered to segregate the lands involved. The interest of the trustee, on behalf of the occupants, therefore constitutes a valid existing right to the lands within the inchoate townsite, within the meaning of Sec. 11(a)(1) of the 1971 Act [ANCSA]. This does not include those tracts settled upon or occupied by individual Natives or groups of Natives where no action has been taken toward application or survey as a Native townsite. The lands occupied by those Natives would be subject to withdrawal and disposition under the terms of Secs. 11 and 14 of the 1971 Act; the segregated inchoate townsite lands would not.
>
> In those cases where an application for a townsite survey is on file, or where the Trustee has made application for patent or final entry has been made by him, and the lands are therefore segregated, all before December 18, 1971, we propose to instruct the Townsite Trustee to complete his trust pursuant to the regulations in 43 CFR 2564, under the authority of the 1926 [Townsite] Act, supra, and other applicable law. Upon approval of the plats of survey for these townsites the Trustee will receive a patent for the surveyed lands and will thereafter issue deeds to the lot occupants, and to each such municipality for the unoccupied and unclaimed lots in the townsite, upon incorporation of the municipality under Alaska law.

Memorandum of June 30, 1972 from Director of BLM to Secretary of the Interior, at 1 (emphasis added).

The Secretary's view was that from the moment a proposed townsite became "segregated," all of the lands it contained were subject to valid existing rights: the rights of occupants to the lands they occupied, and the right of the municipality to all the other unoccupied lands within the townsite's exterior boundaries. As the Regional Solicitor explained in a February 20, 1979 memorandum, "[a]ll of the land within the segregated townsite is therefore covered by pre-existing rights—held by either individual occupants or the municipality itself."[8] Allen Memorandum, supra, at 4. Admittedly, the municipality's rights to unoccupied lands that had not yet been subdivided were "subject to being preempted by an individual occupant until the date of subdivisional survey approval." Id. at 5.

---

7. The parties do not dispute that lands segregated as townsites but not yet patented to the townsite trustee are "public lands" within the terms of ANCSA § 11(a)(1). ANCSA section 3(e), 43 U.S.C. § 1602(e), defines "[p]ublic lands" as "all Federal lands and interests therein located in Alaska except: (1) the smallest practicable tract ... enclosing land actually used in connection with ... any Federal installation, and (2) land selections of the State of Alaska which have been patented or tentatively approved ... or identified for selection by the State prior to January 17, 1969." To the extent that this court upholds the Secretary's interpretation that lands segregated as townsites are "subject to valid existing rights" under ANCSA section 11(a)(1), it need not resolve the issue of when townsite lands are or cease to be "public lands" under ANCSA section 11(a)(1). See Aleknagik Natives Limited v. Andrus, 648 F.2d 496, 502–03 (9th Cir.1980); Allen Memorandum, supra, at 3.

8. The Secretary has never specifically addressed the question of who holds the valid existing rights to unoccupied lands in townsites for which no municipal corporation has yet been organized. Presumably, these rights are held in trust until a municipal corporation can be created. See Royal Harris, 45 IBLA 87, 88 (1980) (quoting Townsite Trustee George Gustafson's letter to Royal Harris).

However, despite the possibility that the municipality's rights to these lands might be partially preempted in the future, the Secretary's position was that these rights, which existed at the time of ANCSA's enactment, were sufficient to constitute "valid existing rights" under ANCSA section 11(a)(1), and therefore precluded withdrawal of the lands to which they applied. *Id.* at 4–5.

### 3. *FLPMA's Impact on the Administration of Townsites*

Congress enacted FLPMA in 1976 in order to modernize, simplify, and systematize the nation's public land laws, "weed out" any statutes relating to public lands that were obsolete, and eliminate any inconsistencies in public lands administration. 43 U.S.C. § 1701; H.R.Rep. No. 1163, 94th Cong., 2d Sess. 1–2, *reprinted in* 1976 U.S. Code Cong. & Ad.News 6175–76. FLPMA's legislative history reveals that Congress regarded the townsite laws in general as "obsolete" and inadequate for the needs of "[m]odern urban development"; moreover, the House Report specifically noted that "[t]he Alaska Native Claims Settlement Act [had] granted to the Natives the lands in 'Native villages,' [thus] rendering the [Alaska] townsite laws obsolete with respect to Natives." *Id.* at 25–26, *reprinted at* 6199–6200. As a result, FLPMA § 703(a), 90 Stat. 2789–90, repealed the Alaska townsite laws of 1891 and 1926, along with a number of other laws. However, FLPMA's general savings provision, § 701(a), 90 Stat. 2786, provides that:

> Nothing in this Act ... shall be construed as terminating any valid lease, permit, patent, right-of-way, *or other land use right or authorization existing on the date of approval of this Act* [October 21, 1976).

FLPMA § 701(a), 90 Stat. 2786 (emphasis added).

The Secretary interpreted FLPMA's provision repealing the Alaska townsite laws in conjunction with its savings provision, and concluded that the effect of FLPMA was to close all townsites to *new* entries and occupancies after October 21, 1976, while preserving the *existing* rights of individual occupants and municipalities to townsite lands as they stood on that date. The Regional Solicitor's February 20, 1979 memorandum to the townsite trustee outlines the Secretary's position:

> The October 21, 1976 repeal of the townsite laws was clearly ["aimed at preventing rights from accruing" under the townsite laws] *in the future. Existing rights were expressly saved by Section 701(a). . . .*
>
> The rights in existence on the date of repeal were the rights of individuals then in occupancy and the right of the municipality to any unoccupied lands. Persons not in occupancy on that date had no rights "existing on the date of approval of this Act" [quoting from FLPMA § 701(a), the general savings provision]. Therefore the repeal in effect closed all townsites to further entry.

Allen Memorandum, *supra*, at 4 (emphasis added).

This position of the Secretary is consistent with his position on the interpretation of the term "valid existing rights" in ANCSA Section 11(a)(1). The Secretary's position in both instances was that at any given point in the development of a townsite, the only "valid existing rights" to the townsite's lands are the rights of occupants to the lands they currently occupy and the rights of the municipality to all unoccupied lands within the townsite's boundaries. According to the Secretary, since ANCSA did not expressly repeal the townsite laws, it left open the possibility that individuals could enter lands that had been previously unoccupied and unsubdivided, and could thus "preempt" the right of the municipality to those lands. In contrast, since FLPMA expressly repealed the townsite laws, it eliminated the means by which individuals could enter and make claims upon vacant and unsubdivided townsite land, and therefore eliminated any possibility that the municipality's rights to these

lands could be preempted. *See* Allen Memorandum, *supra,* at 4–5.

FACTUAL BACKGROUND

The plaintiffs are the village native corporations, village councils, and municipal councils for Aleknagik, Ekwok, and Nondalton, three native villages located in the Bristol Bay region of southwestern Alaska. In 1960–1961, the village councils for these three villages petitioned the Secretary to establish townsites in their villages under ANTA section 3, 43 U.S.C. § 735. Following the filing of these petitions, the townsite trustee made formal entry of each proposed townsite, and initial subdivisional surveys were performed; the Secretary approved the plats of each subdivisional survey in 1969–1970. Aleknagik's townsite consisted of 124.5 acres, of which 66.3 acres were left unsubdivided; Ekwok's townsite encompassed 469.4 acres, of which 413.31 acres were left unsubdivided; and Nondalton's townsite included 629.89 acres, of which 494.83 acres were left unsubdivided. Between 1972 and 1977, the Secretary issued patents to the townsite trustee for the subdivided portions of all three townsites, and the trustee awarded deeds to those individuals occupying lots in the subdivided areas on the dates that the subdivisional survey plats were approved. Moreover, the trustee has conveyed all vacant lots in the subdivided areas of these townsites to the three municipalities of Aleknagik, Ekwok, and Nondalton, in accordance with this court's decision in *City of Klawock v. Gustafson,* No. K 74–2 Civil (D. Alaska, unpublished oral opinion of Nov. 12, 1976).[9] *See also City of Klawock v. Gustafson,* 585 F.2d 428 (9th Cir.1978) (ruling only on city's request for attorneys' fees in district court action).

During the three-year period for making land selections after the passage of ANC-

SA in 1971, the Aleknagik, Ekwok, and Nondalton village corporations were all directed by the BLM not to select any lands that had been segregated within their villages' townsites, even to the extent that those lands remained unsubdivided. These directions were consistent with the 1972 memorandum written by the BLM Director and approved by the Acting Secretary, which had concluded that lands segregated within townsites were "subject to valid existing rights" under ANCSA section 11(a)(1), and therefore were not available for selection by village corporations under ANCSA section 12(a)(1). After the ANCSA land selection period had expired, the BLM advertised that the unsubdivided lands in the three townsites were all open to entry by the general public under the townsite laws. The record indicates that one non-native, defendant Basil Atkinson, entered the unsubdivided portion of the Ekwok townsite prior to the repeal of the townsite laws on October 21, 1976, and built a residence there.[10] Between eighty and ninety non-native individuals staked out lots and built improvements upon the unsubdivided portion of the Nondalton townsite during and after the summer of 1977. No townsite deeds were issued to Atkinson or any of these other individuals.

The Secretary's interpretation of FLPMA's effect on townsite administration, contained in the Regional Solicitor's February 20, 1979 memorandum, supports the plaintiffs' claim that all individuals who began their occupancies of townsite lands after 1976 (which would include all eighty to ninety individual, non-federal defendants in this action, except Atkinson) have no entitlement in those lands under the townsite laws, and therefore should be ejected. *See Aleknagik Natives Limited v. Andrus,* 648 F.2d 496, 504 & n. 4 (9th Cir.1980). The February 20, 1979 memorandum ex-

9. According to the plaintiffs, the three municipalities have already paid the attorneys' fees liens on these lands imposed by the Ninth Circuit in *City of Klawock v. Gustafson,* 585 F.2d 428, 431–32 (9th Cir.1978).

10. The plaintiffs appear to concede that Atkinson entered the Ekwok townsite land prior to

October 21, 1976 in their Statement of Material Facts As to Which There is No Genuine Issue, filed November 19, 1982, although it is suggested in their brief filed contemporaneously that none of the individual defendants had entered the townsite lands prior to October 21, 1976.

plicitly states that: "Persons whose occupancy of Townsite lands commenced after October 21, 1976, have no rights in those lands under the Townsite laws." Allen Memorandum, *supra*, at 1.[11]

The plaintiffs originally brought this action in 1977. In 1978, they applied for a preliminary injunction to enjoin further encroachment upon their villages' townsites. This court denied that application and dismissed the plaintiffs' action for failure to exhaust administrative remedies. The Ninth Circuit reversed, holding that the plaintiffs' failure to exhaust should not preclude the bringing of their action, and concluding that a preliminary injunction should have been granted, because "the plaintiffs [had] a substantial probability of success on the merits and the balance of hardships tip[ped] in their favor." *Aleknagik Natives Limited v. Andrus*, 648 F.2d 496, 504 (9th Cir.1980).

The Secretary petitioned for rehearing, and in denying his petition, the Ninth Circuit emphasized the preliminary nature of its decision:

> Our decision merely requires that the *status quo* be maintained until this suit can be resolved on the merits. It is true that the plaintiffs have demonstrated a strong likelihood of success on the merits, but it still remains to be decided whether they will ultimately prevail.

*Id.* at 505. The plaintiffs' action was then remanded to this court, the intervenors joined in the action, and the parties cross-moved for summary judgment.

### THE PLAINTIFFS' CONTENTIONS

The plaintiffs contend that the Secretary's interpretation of the effect of ANCSA section 11(a)(1) on unsubdivided townsite lands, contained in the BLM Director's June 30, 1972 memorandum, was erroneous. They seek a declaration that ANCSA section 11(a)(1) withdrew from the townsite trustee's control all townsite lands that were vacant and unsubdivided as of December 18, 1971, that these lands must all be conveyed by the Secretary to the Aleknagik, Ekwok, and Nondalton village corporations, and that any current occupants of these lands must be ejected.[12] The plaintiffs also contend that by failing to elicit native participation prior to arriving at his interpretation of ANCSA section 11(a)(1), and by failing to publish that interpretation in the Federal Register, the Secretary violated ANCSA section 2(b), 43 U.S.C. § 1601(b), ANCSA section 25, 43 U.S.C. § 1624, the Freedom of Information Act, specifically 5 U.S.C. § 552(a)(1)(D), and the Administrative Procedure Act, specifically 5 U.S.C. §§ 553(b) and (d).

In the alternative, the plaintiffs contend that even if the unsubdivided townsite lands were not withdrawn under ANCSA

---

**11.** Ironically, acceptance of plaintiffs' position on ANCSA section 11(a)(1) might result in the plaintiffs and other native entities and individuals throughout Alaska obtaining *less* land than if the Secretary's position were adopted. Under the plaintiffs' interpretation, all unsubdivided townsite lands as of 1971 would have been available for selection by native village corporations and would be credited against their total ANCSA allotment. Under the Secretary's interpretation, all unsubdivided townsite lands as of 1976 would be deeded to the municipalities and administered by municipal councils, which in almost all villages are controlled by natives, and the village corporations would receive their full ANCSA allotments *in addition to* these townsite lands. One additional difference is noteworthy. If the townsite lands are conveyed to village corporations under ANCSA, as plaintiffs request, the village corporations acquire only the *surface estate* in those lands; however, if the lands are deeded to the municipal corporations,

consistent with the townsite laws, as the Secretary argues, these corporations acquire *both the surface and subsurface estates* to the lands. *See* 43 U.S.C. § 1613(f).

Furthermore, the record reveals that a large majority of the individuals occupying unsubdivided townsite lands between 1971 and 1976 were natives. Under the plaintiffs' interpretation of ANCSA section 11(a)(1), these individuals might be dispossessed of their lands, while under the Secretary's interpretation, they would not.

**12.** According to the plaintiffs, of the approximately ninety-three individual defendants whom they originally sought to eject in this action, seventy-five or seventy-six have already been defaulted, and an additional five or six have disclaimed any interest in this litigation. The parties all agree that at most, twelve individual, non-federal defendants remain in this action.

section 11(a)(1), the Secretary and townsite trustee violated ANTA section 3 by not administering those lands exclusively for natives. Therefore, the plaintiffs seek an order that all the individual, non-federal defendants must be ejected from their villages' townsite lands, and that all townsite lands in their villages that were unsubdivided as of December 18, 1971 must be deeded to their municipal corporations.

## THE INTERVENORS' CLAIMS

The traditional village councils of English Bay and Port Graham, two native villages on the southwestern tip of the Kenai Peninsula, have intervened in this action and have brought cross-claims against the federal defendants. These village councils are the only governing bodies for their villages: neither village has organized a municipal corporation. Both village councils petitioned the Secretary to establish townsite trusts in their villages in 1963; initial subdivisional surveys were performed in both villages, and the Secretary approved both survey plats prior to December 18, 1971. The townsite trustee made formal entry of both townsites and was issued patents to the subdivided portion of the English Bay townsite in 1972 and the subdivided portion of the Port Graham townsite in 1975. Both townsites still contain some unsubdivided lands.

The intervenors agree with the Secretary (and disagree with the plaintiffs) concerning the validity of the Secretary's position that lands segregated as townsites prior to December 18, 1971 were "subject to valid existing rights" under ANCSA section 11(a)(1), and were therefore not withdrawn for selection by native corporations. However, they part company with the Secretary concerning his interpretation of the effect of FLPMA's repeal of the townsite laws upon the administration of already existing townsites. The intervenors contend that the Secretary's position, expressed in the Regional Solicitor's February 20, 1979 memorandum, that FLPMA foreclosed the

initiation of all new occupancy claims under the townsite laws after October 21, 1976, even in already existing townsites, is erroneous. They contend that in repealing the townsite laws, FLPMA was only intended to preclude the Secretary from creating new townsites, not to prevent the townsite trustee from continuing to administer the land distribution process in existing townsites and thereby effectuating the purposes for which those townsite trusts had been created.

The intervenors maintain that FLPMA's repeal of the townsite laws did not and could not revoke their established townsite trusts. They assert "vested, beneficial interests, as communities" in having the townsite trustee continue to administer their trusts until all their townsite lands have been subdivided, and in having their individual members permitted to initiate claims to lots in their townsite lands that were unsubdivided as of October 21, 1976.

In particular, the intervenors note that one of the main purposes for which their townsite trusts were originally established was to provide the members of their villages with the opportunity to acquire title to lands with protective restrictions upon taxation, execution, and alienation. They contend that if the trustee is not permitted to continue issuing these restricted deeds, and if their unsubdivided townsite lands are simply transferred to a municipal or ANCSA corporation, this important purpose of their townsite trusts will not be effectuated. Therefore, the intervenors seek a declaration from this court requiring the townsite trustee to continue administering their trusts and issuing deeds until their townsite lands are fully subdivided.

## OTHER AFFECTED INTERESTS

The record reveals that the determination in this action of ANCSA's and FLPMA's effects upon townsite lands administration will have a significant impact upon many individuals' entitlements to townsite lands throughout Alaska.[13] At

---

**13.** In reviewing this court's denial of a preliminary injunction in this action, the Ninth Circuit suggested that a decision in the present litiga-

tion concerning the Secretary's interpretation of ANCSA section 11(a)(1) might not affect the rights of any individuals or entities claiming

least 295 individuals in 31 villages, including 191 natives and 104 non-natives or entities, have already received lot awards from the townsite trustee, totaling 332 parcels, for townsite lands that were vacant and unsubdivided at the time of ANCSA's passage.[14] Moreover, many other individuals may still apply for deeds to lands that were vacant and unsubdivided on December 18, 1971, but which they began to occupy prior to October 21, 1976: there are at least 18 villages which were unsubdivided when ANCSA was passed, for which no applications for lot awards have yet been taken. Furthermore, at least 249 deeds to 724 parcels have already been awarded to municipal corporations out of lands that were vacant and unsubdivided on December 18, 1971.[15] All of these lot awards may be at risk if the plaintiffs' interpretation of ANCSA section 11(a)(1) is correct.

The record is less explicit concerning the number of individuals who will be directly affected by a decision on the validity of townsite occupancies that commenced after October 21, 1976. As noted above, in the

Nondalton townsite alone, eighty to ninety individuals began their occupancies after this date. It is likely that other individuals in the state are similarly situated. The records in this case reveal that the townsite trustee may have led individuals to believe that they could still initiate valid townsite occupancies in existing townsites after the passage of FLPMA.[16] *See* Deposition of BLM State Director Curtis McVee, at 8, 38; *Royal Harris,* 45 IBLA 87, 88 (1980). Moreover, based upon the arguments of the intervenors, there are presumably a number of natives in Alaska who seek to obtain restricted deeds for their residential lots, which they can acquire only under the terms of the townsite laws and regulations. These individuals will presumably be disadvantaged if the Secretary's interpretation of the effect of FLPMA upon the townsite laws is upheld.

## ANALYSIS

### 1. Scope of Review

In reviewing the plaintiffs' and intervenors' challenges to the Secretary's inter-

townsite lands in Alaska who are not parties to this action. *See Aleknagik Natives Limited v. Andrus,* 648 F.2d 496, 506 (9th Cir.1980). However, it appears that the effects of this litigation may be much broader. If the Secretary's position concerning ANCSA section 11(a)(1) is not upheld, then as a practical matter, all townsite lands in Alaska that were vacant and unsubdivided as of December 18, 1971 were actually "withdrawn ... [from] appropriation under the public land laws": this would call into question whether any deeds for such lands subsequently issued to individuals or municipalities under the townsite laws are valid. 43 U.S.C. § 1610(a)(1). Moreover, the wording of ANCSA section 12(a)(1) suggests that village corporations would have been required to select any of these lands in the immediate vicinity of their villages: "the Village Corporation ... *shall select* ... [from] the lands withdrawn by ANCSA section 11(a)(1) *all of the township or townships* in which any part of [its] village is located...." 43 U.S.C. § 1611(a)(1) (emphasis added). As a result, a determination in this action that the Secretary misinterpreted ANCSA section 11(a)(1) would appear to have far-reaching consequences.

14. This number is limited to the individuals in those villages whose townsites had not yet been subdivided at the time of ANCSA's passage. It does not include individuals who began occupy-

ing unsubdivided lands between December 18, 1971 and October 21, 1976 in villages for which an initial subdivisional survey had been completed before ANCSA's passage.

15. The amount of land in this category will drastically increase if the Secretary's interpretations regarding ANCSA section 11(a)(1) and FLPMA are correct, because under those interpretations, all land within the exterior boundaries of every townsite that was unoccupied as of October 21, 1976 would be deeded to village municipal corporations.

16. Although the townsite trustee may have given individuals an incorrect interpretation of FLPMA's effect upon the settlement of existing townsites, the Secretary's position on this issue has been consistent. When the townsite trustee requested an opinion on this issue, the Regional Solicitor issued his February 20, 1979 memorandum. As noted above, the position enunciated in the February 20, 1979 memorandum is consistent with the Secretary's position in the June 30, 1972 memorandum that he approved of the effect of ANCSA section 11(a)(1) upon existing townsites. As soon as the townsite trustee became aware of the Secretary's position on the FLPMA issue, he notified individuals whose occupancies had begun after October 21, 1976 of that position. *See, e.g., Royal Harris,* 45 IBLA 87, 88–89 (1980).

pretation of ANCSA sections 11(a)(1) and 12(a)(1) and FLPMA section 701(a) and 703(a), and the effect of these provisions upon townsite administration, I must accord the Secretary's interpretation considerable deference. *Markair, Inc. v. Civil Aeronautics Board,* 744 F.2d 1383, 1385 (9th Cir.1984); *Jones v. Giles,* 741 F.2d 245, 249 (9th Cir.1984). The Secretary is entitled to particular deference in the present action, because he is the official primarily responsible for interpreting and implementing ANCSA, FLPMA and the townsite laws, and for promulgating and administering townsite regulations. The Ninth Circuit has indicated that "[p]roperly accorded, such deference entails affirmance of any interpretation 'within the range of reasonable meanings the words permit,' comporting with the statute's clear purpose." *Alcaraz v. Block,* 746 F.2d 593, 606 (9th Cir.1984) (citation omitted).

It is not this court's function to substitute its judgment for that of the Secretary:

> [The court's] task then, is not to interpret the statutes as we think best, but rather to inquire whether the [agency's] construction was "sufficiently reasonable" to be accepted. "To satisfy th[is] standard it is not necessary for a court to find that the agency's construction was the only reasonable one or even the reading the court would have reached if the question initially had arisen in a judicial proceeding."

*Kunaknana v. Clark,* 742 F.2d 1145, 1150 (9th Cir.1984) (quoting *Western Pioneer, Inc. v. United States,* 709 F.2d 1331, 1335 (9th Cir.1983)); *accord, National Treasury Employees Union v. Federal Labor Relations Authority,* 732 F.2d 703, 706 (9th Cir.1984) ("If an agency's construction of the statute that it is primarily responsible for implementing is *reasonably defensible,* we may not reject that construction simply because we prefer another view") (emphasis added).

## 2. Challenges to the Secretary's Interpretation of ANCSA

■ The plaintiffs challenge the Secretary's interpretation that land which was vacant and unsubdivided on December 18, 1971, but which had previously been segregated within the exterior boundaries of a townsite, was "subject to valid existing rights" under the terms of ANCSA section 11(a)(1), and therefore was not withdrawn for selection by native village corporations under ANCSA section 12(a)(1). Because I conclude that the Secretary's interpretation was " 'within the range of reasonable meanings [that] the words [of ANCSA section 11(a)(1) ] permit,' " and comports with the purposes of ANCSA, I must affirm the Secretary's interpretation and reject the plaintiffs' challenge. *See Alcaraz,* 746 F.2d at 606.

The plaintiffs' challenge centers upon the meaning of the term "valid existing rights," as it applies to lands segregated for townsites prior to December 18, 1971. This term is not explicitly defined either in the text of ANCSA or in its legislative history. The plaintiffs and Secretary agree that on the date of ANCSA's passage, individual occupants had "valid existing rights" to those townsite lands they currently occupied, and that village municipal corporations had "valid existing rights" to all unoccupied townsite lands for which a subdivisional survey had previously been approved.[17] However, the plaintiffs reject the Secretary's conclusion that village municipal corporations also had "valid existing rights" to all unoccupied townsite lands for which *no* subdivisional survey had yet been approved—rights which, the Secretary acknowledges, were subject to being preempted if individuals began occupying those lands before a subdivisional survey encompassing them was approved. *See* Allen Memorandum, *supra,* at 5.

What is potentially troubling about the Secretary's position that municipalities had

---

17. As noted above, under 43 C.F.R. § 2565.3(c), once a subdivisional survey is approved, all unoccupied lands contained within it are automatically deeded to or sold for the benefit of the village municipal corporation, and individuals can no longer initiate occupancies on those lands under the townsite laws.

"existing rights" to unoccupied, unsubdivided townsite lands on December 18, 1971 is that the municipalities neither possessed those lands on that date, nor was there any guarantee that they would ever possess them.[18] Their "right" to the lands must be viewed as somewhat attenuated. It was contingent upon other occupants not taking up those lands under the townsite laws, as well as contingent upon the completion and approval of a subdivisional survey. However, if these two conditions were satisfied for a given set of lands, the municipality would receive title. It was not required to take any further action prior to acquisition. Thus, municipalities appear to have had a recognized property interest or right in the unoccupied lands that had been segregated as a townsite from the public domain. Since the rights of eventual ownership to townsite lands could be preempted only by individuals who fully complied with townsite requirements, municipalities' entitlements to these lands would be superior to those of all other potential claimants. *See* 43 C.F.R. § 2091.4; Gustafson Affidavit, *supra*, at 2. Therefore, it was not unreasonable for the Secretary to conclude that municipalities had an entitlement to these lands under the townsite laws from the time the lands were segregated from the public domain.[19]

Moreover, the Secretary's position is that the rights of municipalities to unoccupied, unsubdivided townsite lands were "valid" and "existing" on the date of ANCSA's enactment, as those terms were used in ANCSA section 11(a)(1), even though the rights might not be irrevocable. According to the Secretary, even if these rights could someday be preempted, as long as they existed intact on December 18, 1971, they were sufficient, under the terms of section 11(a)(1), to prevent the townsite lands to which they applied from being withdrawn for selection by native villages. *See* Allen Memorandum, *supra*, at 5.

Although I do not consider the Secretary's interpretation of the term "valid existing rights" in this context to be the only possible one, I conclude that it is a reasonable reading of the words as they appear in ANCSA section 11(a)(1), and I must accept the Secretary's interpretation. Moreover, the plaintiffs have failed to establish that the Secretary's reading of section 11(a)(1) is unreasonable or unfounded. They argue that municipalities have no "vested" rights in townsite lands prior to approval of a subdivisional survey—a position which the Secretary would endorse—but they fail to address the Secretary's interpretation that municipalities have "valid" rights to unoccupied townsite lands following a subdivisional survey.

Plaintiffs contend that the "valid existing rights" which Congress sought to preserve in ANCSA, such as the rights of homestead entrymen, individuals with native allotments, and persons leasing property from the federal government, are all discussed in their own specific provisions in ANCSA. *See, e.g.,* 43 U.S.C. §§ 1613(g) (lessees and permittees of government property), 1617(a) (individuals with native allotments), 1621(b) (homestead entrymen), 1621(c) (mining claimants). As a result, they suggest Congress did not intend to cover any townsite-related rights when it used the term "valid existing rights." However, this argument proves too much. If the term "valid existing rights" does not encompass any rights or property interests derived from the townsite laws, then all individuals occupying townsite lands on December 18, 1971 who had not yet received deeds to their

---

**18.** The fact that this "valid existing right" did not involve current possession of the property in question and was also subject to preemption by other parties appears to distinguish it from most, if not all, of the other "valid existing rights" mentioned in ANCSA. *See, e.g.,* 43 U.S.C. § 1613(g) (1982).

**19.** The value of these "rights" possessed by municipalities is well illustrated in the present case. The Secretary's position is that with FLPMA's

repeal of the townsite laws in 1976, no new occupancies could be commenced under those laws, and municipalities' rights to unoccupied townsite lands could no longer be preempted. *See* Allen Memorandum, *supra*, at 5. At that point, under the Secretary's interpretation, municipalities' pre-existing rights to unoccupied lands effectively gave them control of large quantities of acreage.

property must be ejected, and their lands must be conveyed to village corporations. This is clearly not consistent with the plaintiffs' position. They are willing to concede that these occupants had rights that were protected under ANCSA section 11(a)(1).

Furthermore, all of the provisions cited by the plaintiffs as enumerating "valid existing rights" were included in ANCSA because they altered the substantive requirements, timing, or procedures for maintaining these various types of property claims. Under the Secretary's interpretation of ANCSA § 11(a)(1) and the townsite laws, ANCSA did not alter the requirements or procedure relating to townsite claims, and therefore, no specific provision regarding townsites was necessary. Thus, the absence of a provision discussing townsites in ANCSA is not inconsistent with the Secretary's interpretation. The plaintiffs have therefore failed to demonstrate that the Secretary's interpretation of ANCSA section 11(a)(1) conflicts with the provision's language or that of other ANCSA provisions.[20]

The plaintiffs also contend that the Secretary's interpretation of section 11(a)(1) conflicts with the purposes of ANCSA as a whole, and it is on this ground that they focus their strongest attack. Citing portions of ANCSA's legislative history, they argue that Congress intended in ANCSA to provide native village corporations with the central lands in their villages, as well as with a "buffer zone" of surrounding lands, which would insulate these villages from outside influences and enable village residents to engage in non-commercial and subsistence activities. As a result, the plaintiffs argue, Congress intended to prevent lands in native villages from being appropriated by parties other than village corporations after 1971, and especially intended to prevent non-natives from entering and settling on these lands.[21] Therefore, the

---

**20.** The Ninth Circuit's criticisms of the Secretary's interpretation of ANCSA section 11(a)(1) in its opinion granting the preliminary injunction in this action do not mandate a different result. The Ninth Circuit concluded that "it would be anomalous to say that the trustee's entry [into a proposed townsite] creates an independent valid existing right *on behalf of the trustee,* a federal agent." *Aleknagik Natives Limited v. Andrus,* 648 F.2d 496, 502 (9th Cir. 1980) (emphasis added). The Secretary has never contended that the valid existing right at issue in this case belonged to the trustee; he has always maintained that it belonged to the municipal corporation in each village. Moreover, the Ninth Circuit opinion focused upon the issue of who holds *title* to unoccupied, unsubdivided townsite lands. It did not examine the issue of whether the municipality could possess a *"valid,"* although not a *"vested,"* right to those lands. *See id.*

Finally, the Ninth Circuit opinion suggested that the Secretary's interpretation of the term "valid existing rights" in ANCSA section 11(a)(1) conflicts with the way that the term must be interpreted in section 11(a)(2). *Id.* at 503 & n. 3. It reasoned that if the term "valid existing rights" in section 11(a)(1) applies to lands that were segregated under the townsite laws, as the Secretary has concluded, then the term "valid existing rights" in section 11(a)(2) must cover lands that were segregated under the Alaska Statehood Act. *Id.* at 503 n. 3. Since the Ninth Circuit concluded that this would make section 11(a)(2) essentially meaningless, it contended that the Secretary's interpretation of "valid existing rights" in section 11(a)(1) must be erroneous.

By its very nature, the term "valid existing rights" must be interpreted on a case-by-case basis, depending upon the laws under which the "existing rights" ostensibly arose and the effect upon those rights that Congress sought to achieve in ANCSA. The Secretary can very plausibly maintain that "valid existing rights" arose under the townsite acts when lands were segregated, but did not arise under the Statehood Act when lands were similarly segregated. The reasonableness of these interpretations will depend upon the backgrounds, details, and legislative histories of the Townsite and Statehood Acts, as well as the legislative history and language of ANCSA. Therefore, I see no inevitable conflict between the Secretary's interpretation of the term "valid existing rights" in section 11(a)(1) and the way the term is used in section 11(a)(2).

**21.** The Ninth Circuit stated in its preliminary injunction opinion that: "It would appear incongruous for Congress to withdraw these native villages and the land surrounding them from appropriation under public land laws [in ANCSA section 11(a)(1)] and yet, at the same time, allow non-Natives to occupy and obtain lots within the townsites after ANCSA's enactment." 648 F.2d at 503. However, this comment appears to overlook the fact that besides providing for the conveyance of lands to native village corporations, ANCSA also contains a number of provisions recognizing and protecting the "valid existing rights" of non-natives as

plaintiffs maintain that the Secretary violated Congress' intent and the purposes of ANCSA when he permitted the settlement of townsite lands to continue in native villages after 1971.

While I agree with the plaintiffs that a major purpose of ANCSA was to preserve the integrity of native villages and native peoples' ability to protect their traditional way of life, I do not agree that this was the sole purpose of ANCSA or that this purpose could only be achieved by turning over all vacant, unsubdivided townsite lands to village corporations. Congress was attempting in ANCSA to balance a great number of diverse interests, and to produce a fair, lasting, and comprehensive resolution of the issues relating to native land claims in Alaska. *See* 43 U.S.C. § 1601. I conclude that leaving village townsite lands intact and not withdrawing them under ANCSA section 11(a)(1) served many of Congress' objectives in enacting ANCSA and benefitted Alaska natives as a whole. Therefore, even though continuing to administer these village townsites enabled some non-natives to settle on village lands and enabled a number of native and non-native individuals to acquire title to village lands after 1971, I cannot conclude that this policy violated the principles and purposes of ANCSA.[22]

I cannot accept the contention that merely because the Secretary's interpretation of section 11(a)(1) enabled non-natives to set-

tle on village lands, it therefore conflicted with ANCSA's purposes. There is nothing in ANCSA's text or legislative history to indicate that Congress intended to exclude non-natives from lands in the villages or to convert the villages into all-native enclaves. On the contrary, ANCSA contains several provisions specifically designed to protect the rights of non-natives (as well as natives) to remain on lands conveyed by ANCSA to village corporations. *See, e.g.,* 43 U.S.C. § 1613(c) (protecting rights to primary places of residence or business); 43 U.S.C. § 1613(g) (protecting rights to lands previously leased or acquired under a permit from the federal government). Moreover, Congress specifically announced its intent to protect *all* valid existing rights in ANCSA, regardless of the individuals to whom they belonged or the location of the lands to which they applied. *See* Conf.Rep. No. 746, 92d Cong., 1st Sess. 37, *reprinted in* 1971 U.S.Code Cong. & Ad.News 2192, 2247, 2250 ("All valid existing rights ... are preserved"). Therefore, I cannot agree that because the Secretary's interpretation of section 11(a)(1) indirectly permitted some non-natives to settle in native villages after 1971, it is inconsistent with the principles of ANCSA.

Nor can I agree with the plaintiffs' contention that the Secretary's interpretation of section 11(a)(1) violated ANCSA's principles by permitting parties other than village corporations to appropriate village

well as natives to lands in native villages. *See, e.g.,* 43 U.S.C. § 1613(c) (primary place of residence or business); 43 U.S.C. § 1613(g) (leaseholds and rental property). Thus, interpreting section 11(a)(1) to permit natives and non-natives to continue settling side by side in existing village townsites would not necessarily be "incongruous" with all of ANCSA's other provisions.

**22.** This court must either determine that ANCSA section 11(a)(1) withdrew all vacant, unsubdivided townsite lands, and thereby cancelled their townsite status, or that it left them intact as townsite lands. Because ANCSA did not alter the substantive operation of the townsite laws, or alter the rights of municipalities under those laws, a decision by this court that ANCSA did not withdraw unsubdivided townsite lands would necessarily entitle individuals to move

onto those lands and preempt municipalities' existing rights to them.

Therefore, in evaluating whether withdrawing these lands or preserving them in townsite status would have coincided more fully with ANCSA's purposes and Congress' intent, this court must determine whether the combined effects of maintaining these lands as townsites would serve ANCSA's purposes or not. Thus, if preserving these lands as townsites permitted some non-natives and other individuals to gain title to village lands after 1971, which would not, standing alone, be entirely consistent with all of ANCSA's objectives, but it also produced benefits to villages' municipal corporations and thereby served ANCSA's purposes, this court must weigh these two types of effects against one another, and determine whether the net effect of preserving these lands in townsite status would be to further ANCSA's objectives.

lands after 1971. In support of this argument, the plaintiffs cite a portion of ANCSA's legislative history, which indicates that Congress intended lands to be withdrawn under ANCSA section 11(a)(1) in part "to insure that the land selection rights of Native Villages ... will not be frustrated by ... *the creation of new interests in lands* under the public lands laws." Conf.Rep. No. 746, 92d Cong., 1st Sess. 43, *reprinted in* 1971 U.S.Code Cong. & Ad.News 2247, 2256 (emphasis added); *see also Aleknagik Natives Limited v. Andrus*, 648 F.2d 496, 503 (9th Cir.1980) (quoting this passage).[23]

This argument misses the thrust of the Secretary's interpretation of section 11(a)(1). According to his interpretation, segregated townsite lands were already "subject to [the] valid existing rights" of municipal corporations on December 18, 1971. The municipalities' interests in these lands were not "new" or created after the passage of ANCSA. They were like any other valid interests in land that predated ANCSA, and thus, the lands to which they applied were not available for selection by village corporations under sections 11(a)(1) and 12(a)(1). Like other lands that were "subject to valid existing rights" on December 18, 1971, and which were therefore not available for village corporation selection, these townsite lands could be freely conveyed or transferred in ownership after 1971 without violating ANCSA. The legislative history cited by the plaintiffs is thus inapposite. It only asserts that those lands not subject to valid existing rights on December 18, 1971 should all be made available for selection by village corporations.

Finally, I cannot accept the plaintiffs' contention that the Secretary's interpretation of section 11(a)(1) violated the principles and purposes of ANCSA because it failed to withdraw centrally located, vacant lands in native villages, which Congress intended to convey to the village corporations. According to the plaintiffs, Congress intended to provide these lands to village corporations so that they could preserve the traditional native and subsistence way of life in their villages, as well as engage in economic development. While I agree that Congress regarded village corporations as an important mechanism for promoting native self-determination and economic development in the villages, I cannot agree that Congress regarded these corporations as the only entities capable of preserving the integrity of the villages. Moreover, I cannot agree that the Secretary's interpretation of section 11(a)(1) has thwarted the operations of village corporations, or that it conflicts with ANCSA's objectives of protecting natives' traditional and subsistence way of life. After a careful examination of the Secretary's and the plaintiffs' proposed interpretations of section 11(a)(1), I must conclude that the Secretary's interpretation better serves ANCSA's purposes and the needs of Alaska natives.

Under the plaintiffs' proposed interpretation of section 11(a)(1), all vacant, unsubdivided townsite lands would have been withdrawn on December 18, 1971. The surface estate in these lands would then have been conveyed to the local village corporations as part of their total ANCSA entitlements, and the subsurface estate would have been conveyed to the corresponding regional cor-

---

**23.** In its preliminary injunction opinion, the Ninth Circuit also cited another passage from ANCSA's legislative history, which stated that the lands surrounding native villages were being temporarily withdrawn, subject to valid existing rights, in order "to insure that these lands are *protected from disposition* to other parties pending a determination of the villages eligible for benefits under the Act." 648 F.2d at 503 (quoting S.Rep.No. 405, 92d Cong., 1st Sess. 136 (1971)) (emphasis added). Like the excerpt of legislative history quoted in the text, this passage merely restates what the text of section 11(a)(1) provides: that from the date of ANCSA's passage onward, no *new* interests were to be created in public lands surrounding native villages under the public land laws, although all "valid *existing* rights" were to be preserved. This passage does not address the issue of exactly what constitutes a valid existing right under section 11(a)(1) or whether municipalities had such rights in vacant, segregated townsite lands. As a result, it does not provide any assistance in determining whether the Secretary's interpretation of section 11(a)(1) is correct.

porations. *See* 43 U.S.C. §§ 1610(a)(1), 1611(a)(1), 1613(f). No individuals occupying these lands after the passage of ANCSA would have acquired any rights to them under the townsite laws. Moreover, once they had received their ANCSA entitlement lands, the village corporations would then have been required, under ANCSA section 14(c)(3), 43 U.S.C. § 1613(c)(3), to convey to their corresponding municipal corporations "title to ... the improved land on which the Native village is located and as much additional land [not less than 1,280 acres] as is necessary for community expansion."[24] 43 U.S.C. § 1613(c)(3).

In contrast, under the Secretary's interpretation, all vacant, unsubdivided townsite lands in the villages would remain in townsite status. Eventually, subdivisional surveys would be approved for these lands, and a substantial portion of them (including *both* the surface and subsurface estates) would be conveyed to local municipal corporations. Village corporations would initially receive the same quantity of lands as under the plaintiffs' interpretation (since this amount is prescribed in ANCSA), but there would be two significant distinctions: first, in most cases, they would not need to turn over any of these lands to their municipal corporations under section 14(c)(3),[25] and would therefore end up with a larger quantity of lands, and second, the lands they would receive would be outside the exterior boundaries of their villages' segregated townsites. Individuals who initiated

occupancies of townsite lands between December 18, 1971 and October 21, 1976 and who complied with townsite laws and regulations would eventually receive deeds to the lots they occupied. Natives among this number would be given the option of receiving unrestricted or restricted deeds to their lots.

Thus, in 1971–1972, when the Secretary was formulating his interpretation of section 11(a)(1), it was completely reasonable for him to conclude that the interpretation he ultimately adopted would best serve the purposes of ANCSA and the needs of Alaska natives. Under his interpretation, village corporations would almost always end up with a larger quantity of lands than under the plaintiffs' interpretation, since these corporations would generally not need to turn over any of their ANCSA entitlement lands to their corresponding municipal corporations. In addition, under the Secretary's interpretation, village municipal corporations, which in most villages would be controlled by natives,[26] would be provided with a substantial quantity of land—eventually amounting to over two-thirds of all townsite parcels conveyed by the townsite trustee between 1971 and 1976 —which they would not receive at all under the plaintiffs' interpretation.

To the extent that these lands being conveyed to municipal corporations would be centrally located[27] or especially significant to the integrity or future of their villages,

**24.** Section 14(c)(3) provides that a minimum of 1,280 acres must be conveyed by the village corporation to the municipality, unless the two parties agree in writing to a lesser amount. 43 U.S.C. § 1613(c)(3). The plaintiffs argue that the existence of section 14(c)(3) indicates that Congress intended their interpretation of section 11(a)(1). This does not necessarily follow: Congress may have intended section 14(c)(3) to apply primarily in villages where there were no segregated townsite lands, and may have assumed that municipalities would simply waive their section 14(c)(3) entitlements in those villages where they were already receiving townsite lands.

**25.** Since these villages' municipal corporations would already have received townsite lands, they probably would not need additional lands for "community expansion" from their village

corporations, and could therefore waive their rights to such lands under section 14(c)(3). *See* 43 U.S.C. § 1613(c)(3).

**26.** For example, the three plaintiff municipal councils in this action are all predominantly native, as are the two intervenor village councils.

**27.** It would appear that given the terms of ANCSA section 14(c)(3), any centrally located lands in villages would be conveyed to municipal corporations, regardless of whether the Secretary's or the plaintiffs' interpretation of section 11(a)(1) is adopted. The main difference between the two interpretations concerning these lands is that they would be counted as part of each village's ANCSA entitlement under the plaintiffs' interpretation, but not under the Secretary's.

as the plaintiffs contend they often would be, municipal corporations would probably be better suited to exert and retain control over these lands than village corporations. First, municipal corporations would control both the surface and subsurface estate of these lands, as contrasted to village corporations, which can only acquire the surface estate. *See* 43 U.S.C. § 1613(f). Second, municipal corporations would probably receive broader tax exemptions for these lands over time than village corporations, and would probably be less concerned about generating profits from them than village corporations, which would often be organized as for-profit corporations. *See* 43 U.S.C. §§ 1607(a), 1620(c)–(d). Thus if it were important for a village to leave certain lands undeveloped, either to insulate itself from outside influences or to enable its members to engage in non-commercial or subsistence activities, the village's municipal corporation would probably have more economic flexibility to maintain the lands in this condition than its village corporation. Moreover, even if lands within the possession of a village's municipal corporation were needed by its corresponding village corporation for some economic use, there is nothing in ANCSA's text or legislative history to prohibit the municipality from selling, trading, leasing, or otherwise conveying those lands to the village corporation. As a result, there does not appear to be any disadvantage in terms of ANCSA's purposes to providing lands formerly within village townsites to municipal corporations.

The legislative history cited by the plaintiffs does not establish otherwise. The plaintiffs cite excerpts of ANCSA's legislative history which identify "the need to grant each eligible village lands for community expansion and to provide protection and a buffer from the intrusion by others," and which espouse the belief that "each village should have the opportunity to select land to protect its immediate environment." S.Rep. No. 925, 91st Cong., 2d Sess. 59 (1970) (discussing S. 1830, a predecessor of ANCSA); *Hearings on S. 35, S. 1835 and S. 1571 Before the Senate Committee on Interior and Insular Affairs,* 92d Cong., 1st Sess., vol. 2, at 447 (1971) (comments of Secretary Rogers Morton). The plaintiffs also cite a passage from the legislative history expressing the concern that:

> [W]ithout title to the lands they use and occupy, Alaska Natives are defenseless against commercial development which changes the character of and sometimes depletes subsistence resources, and against the population influx which disorganizes indigenous ways of life.

S.Rep. No. 405, 92d Cong., 1st Sess. 72 (1971). None of these passages indicates that Congress' intent in providing lands to villages would be undermined by the Secretary's interpretation of section 11(a)(1), which would provide *more* land to village and municipal corporations than the plaintiffs' interpretation, and which would provide *two* entities, instead of one, with the wherewithal to preserve the integrity of the villages.

Furthermore, the interpretation of section 11(a)(1) adopted by the Secretary enabled individuals to continue settling on segregated townsite lands, and to eventually acquire title. It would have been reasonable for the Secretary to predict in 1971–1972 that most individuals who would benefit from the continuation of townsite settlement during the next few years would be natives. In fact, between 1971 and 1976, almost two-thirds of those individuals receiving townsite deeds were natives. Moreover, natives receiving townsite deeds during this period could opt for restricted deeds, which would increase the likelihood that they would be able to retain their lands over time and would eliminate any pressure to generate a profit from those lands. Thus, it was reasonable for the Secretary to conclude that leaving townsite lands open to settlement would benefit natives and not violate the principles of ANCSA.

Finally, the Secretary could reasonably have believed in 1971–1972 that his interpretation of section 11(a)(1) would reduce the likelihood of litigation over land ownership in the villages, and thereby ensure

that village corporations would receive clear title to their ANCSA lands. ANCSA section 2(b), 43 U.S.C. § 1601(b), provides that "the [ANCSA] settlement should be accomplished rapidly, with certainty ... [and] without litigation." 43 U.S.C. § 1601(b). Had the Secretary simply withdrawn all vacant, unsubdivided townsite lands and conveyed them to village corporations, as the plaintiffs suggest, it is likely that many municipal corporations would have initiated litigation against him, claiming that they had valid existing rights (or trust-related rights) to those lands, and would thereby have tied up lands that had been conveyed to village corporations. The Secretary's decision to take a cautious approach, especially where there was no overall sacrifice to native interests, in order to avoid this type of scenario seems completely reasonable. For all these reasons, the Secretary's interpretation of section 11(a)(1) appears to serve the needs of Alaska natives and the purposes of ANCSA better than the plaintiffs' proposed interpretation.[28]

The plaintiffs' other arguments challenging the Secretary's interpretation of section 11(a)(1) are also without merit. The plaintiffs contend that the Secretary's interpretation of the provision has been inconsistent over the years, and therefore is unworthy of deference. Yet after examining the material cited by the plaintiffs, I am unable to agree. The Secretary issued his official interpretation of section 11(a)(1)'s effect upon segregated townsite lands in 1972, reiterated that position in a passing remark contained in a 1977 Decision and Memorandum concerning valid existing rights under ANCSA, and then, as noted above, issued a 1979 Memorandum concerning the effect of FLPMA's repeal of the townsite laws that reaffirmed his original 1972 interpretation. *See* Memorandum of June 30, 1972 from Director of BLM to Secretary of the Interior; "Valid Existing Rights under the Alaska Native Claims Settlement Act," Secretarial Order No. 3016, 85 Interior Dec. 1, 6

(1977) (indicating that in ANCSA, "Congress ... intended to protect [the valid existing] rights of municipalities [and] individuals leading to the acquisition of title under such Federal laws as the Townsite Act [and] the Homestead Act"); Allen Memorandum, *supra*. The plaintiffs have not cited any specific decisions of the Secretary that are in conflict with his 1972 interpretation. Therefore, I must reject their claims of inconsistency.

The plaintiffs also suggest that the Secretary's interpretation of section 11(a)(1) and his whole administration of the townsite program were "malevolent" and involved bad faith. There is nothing in the record to support these claims.

Finally, the plaintiffs contend that the Secretary's interpretation of section 11(a)(1) resulted in continued administration of then-existing townsites, and thus ran afoul of ANCSA section 2(b), 43 U.S.C. § 1601(b), which provides that the ANCSA "settlement should be accomplished rapidly ... *without creating a ... lengthy ... trusteeship.*" 43 U.S.C. § 1601(b) (emphasis added). I cannot accept this claim. In finding that ANCSA did not discontinue the townsite program where it already existed, the Secretary did not interpret ANCSA to "*create*" any trusteeship; he simply interpreted ANCSA not to terminate townsite trusts. Moreover, there was no guarantee when the Secretary issued his interpretation of section 11(a)(1) in 1972 that any continued administration of existing townsites would be "lengthy." As events transpired, the townsite program continued in full force only for another four years, until 1976. Therefore, I cannot conclude that the Secretary's interpretation of section 11(a)(1) violated ANCSA's policy against establishing a "lengthy trusteeship."

For all these reasons, I conclude that the Secretary's interpretation of section 11(a)(1) was reasonable and comported with the purposes of ANCSA. I therefore reject

---

**28.** The plaintiffs argue that because section 11(a)(1) is ambiguous, it must be construed in favor of Alaska natives. Because I conclude that the Secretary's interpretation of the provision better serves the needs of Alaska natives than the plaintiffs' proposed interpretation, I need not reach this issue.

the plaintiffs' challenges to his interpretation.[29]

▉ The plaintiffs' remaining claims against the Secretary are also without merit. The plaintiffs claim that the Secretary violated the Administrative Procedure Act (APA), 5 U.S.C. §§ 553(b) and (d), the Freedom of Information Act (FOIA), 5 U.S.C. § 552(a)(1)(D), and ANCSA section 25, 43 U.S.C. § 1624, by failing to publish his interpretation of ANCSA section 11(a)(1) in the Federal Register. However, the Secretary's analysis of section 11(a)(1)'s effect upon townsite lands was an "interpretative," rather than a "substantive," ruling, since it did not "effect a change in existing law or policy," but instead " 'merely clarif[ied] or explain[ed]' .... 'what the [Secretary] th[ought] the statute [meant].' " *Alcaraz*, 746 F.2d at 613 (citations omitted); *Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir.1983). Therefore, the Secretary was not required under the APA to publish notice of his interpretation in the Federal Register. *Alcaraz*, 746 F.2d at 613; *Powderly*, 704 F.2d at 1098; 5 U.S.C. § 553(b)(A).

▉ Moreover, since the Secretary's interpretation of section 11(a)(1) only "clarified" the meaning of that provision and did not itself change the substantive rights of natives or village corporations under ANCSA, the Secretary was also not required under the FOIA to publish his interpretation in the Federal Register. *Powderly*, 704 F.2d at 1098; 5 U.S.C. § 552(a)(1)(D). Furthermore, even if the Secretary had been required under the FOIA to publish his interpretation, the record indicates that the plaintiffs had "actual and timely notice" of his interpretation, and were not prejudiced by his failure to publish it. Thus, the plaintiffs do not have a basis for a viable FOIA claim under any circumstances. *See* 5 U.S.C. § 552(a)(1); *Zaharakis v. Heckler*, 744 F.2d 711, 714 (9th Cir.1984). Finally, ANCSA section 25 does not require the Secretary to publish regulations or interpretations relating to ANCSA's provisions, as the plaintiffs appear to suggest. It merely "authorizes" him to publish such information. *See* 43 U.S.C. § 1624. Thus, all the plaintiffs' claims based upon the Secretary's failure to publish his interpretation of section 11(a)(1) must fail.

▉ The plaintiffs also contend that the Secretary violated ANCSA section 2(b), 43 U.S.C. § 1601(b), requiring "maximum participation by Natives in decisions affecting their rights and property," by issuing his interpretation of section 11(a)(1) without first consulting various native groups. However, the plaintiffs have failed to cite any authority to indicate that section 2(b) provides them with any additional substantive or procedural rights beyond those already enumerated in the APA, the FOIA,

---

**29.** Two arguments raised by the Secretary to support his interpretation of section 11(a)(1) deserve mention, although the court does not find them persuasive. First, the Secretary argues that for this court to accept the plaintiffs' interpretation of section 11(a)(1), it would have to conclude that ANCSA contained an "implied repeal" of the townsite laws, which would be a disfavored interpretation. Strictly speaking, the plaintiffs do not argue that ANCSA repealed the townsite laws. They simply argue that ANCSA section 11(a)(1) withdrew unsubdivided townsite lands in the townships surrounding native villages. Under the plaintiffs' interpretation, the townsite laws continued in effect in the previously subdivided portions of existing townsites, and new townsites could be created in the future in areas other than native villages. Therefore, the plaintiffs are not really maintaining that any repeal of the townsite laws occurred.

Second, the Secretary, along with the plaintiffs, attempts to argue that the legislative history surrounding FLPMA's repeal of the townsite laws in 1976 supports his interpretation of section 11(a)(1). As noted above, Congress stated its belief in 1976 that ANCSA had "render[ed] the [Alaska] townsite laws *obsolete* with respect to Natives." H.R.Rep. No. 1163, 94th Cong., 2d Sess., 25–26, *reprinted in* 1976 U.S.Code Cong. & Ad.News 6199–6200 (emphasis added). This statement can be reconciled with either party's interpretation of section 11(a)(1). The townsite laws were "obsolete" either because no *new* townsites could be created in the areas surrounding native villages (the Secretary's interpretation), or because no unsurveyed lands remained around the villages that could be used either for new townsites or for further settlement of existing townsites (the plaintiffs' interpretation). Therefore, this 1976 legislative history is inconclusive on the proper interpretation of ANCSA section 11(a)(1).

and ANCSA's other provisions. *See Koniag, Inc., Village of Uyak v. Andrus*, 580 F.2d 601, 610 (D.C.Cir.1978). Thus, the plaintiffs' ANCSA section 2(b) claim must also fail.

▪ Finally, the plaintiffs contend that even if the secretary's interpretation of section 11(a)(1) was correct and ANCSA did not withdraw unsubdivided townsite lands for selection by village corporations, the Secretary and townsite trustee nevertheless violated ANTA section 3 by failing to administer those townsite lands exclusively for natives.[30] This court previously rejected this precise claim in its 1976 decision in *City of Klawock v. Gustafson*, No. K 74–2, at 9, 14 (D. Alaska, unpublished oral opinion of November 12, 1976). In that action, this court ruled, based primarily upon the text and legislative history of ANTA, that ANTA had been "enacted [in 1926] to supplement the 1891 [Alaska Townsite] Act and thereby [to] extend its benefits [for the first time] to non-citizen Alaska Natives"; Thus, ANTA's provisions relating to townsites in native villages were "not intended to foreclose non-Natives from occupying land in Native townsites and applying for trustee deeds," since non-natives' rights to settle in townsites were already protected by existing townsite laws. *Id.* at 14, 17. After reviewing the *City of Klawock* decision, I continue to believe that its analysis of ANTA is correct, and I hereby incorporate its analysis by reference in this decision. I therefore reject the plaintiffs' claim based on ANTA section 3.

### 3. Challenges to the Secretary's Interpretation of FLPMA

▪ The Secretary's position, as enunciated in the Regional Solicitor's February 20, 1979 memorandum, is that after

FLPMA's repeal of the townsite laws in 1976, no new rights could arise under the townsite laws, and therefore, no valid new occupancies could be initiated in existing townsites. His position is challenged by the intervenors and by the non-federal defendants other than Basil Atkinson, all of whom began occupying their townsite lots after 1976. Because I conclude that the Secretary's position is reasonable in light of FLPMA's statutory language, comports with the purposes of FLPMA, and does not violate the terms of the intervenors' townsite trusts or any fiduciary responsibility on the part of the Secretary, I affirm the Secretary's interpretation and reject the intervenors' and non-federal defendants' challenges. *See Alcaraz*, 746 F.2d at 606.

The Secretary's interpretation is completely consistent with the language of FLPMA section 703(a), 90 Stat. 2789–90, which repealed the townsite laws "effective on and after the date of approval of [FLPMA]," and section 701(a), 90 Stat. 2786, FLPMA's savings provision, which preserved only those "valid ... land use right[s] or authorization[s] [that were already] existing on th[at] date." 90 Stat. 2786, 2789–90. Under the Secretary's interpretation, when these two provisions are read together, FLPMA terminated the Secretary's authority to recognize any claims arising under the townsite laws after October 21, 1976, unless a claimant had already acquired a "valid ... land use right" to particular lands. Allen Memorandum, *supra*, at 4. Thus, individuals who had not yet occupied lands prior to FLPMA's passage could not subsequently acquire any rights to those lands under the townsite laws. They had no "valid land use rights" to townsite lands, as that term was used in FLPMA section 701(a), based simply upon their legal right, prior to FLPMA's passage, to someday occupy those lands.[31]

---

30. ANTA section 3, 44 Stat. 630, 43 U.S.C. § 735 (repealed 1976), provided that: "Whenever he shall find nonmineral public lands in Alaska to be claimed and occupied by Indians and Eskimos of full or mixed blood, Natives of Alaska, as a town or village, the Secretary of the Interior is authorized to have such lands surveyed ... and to issue a patent therefor to a trustee who shall convey to the individual Indian or Eskimo the land so claimed and occupied...."

31. To read the term "valid land use rights" in FLPMA section 701(a) so broadly as to encompass the right to occupy townsite lands in the future would essentially permit section 701(a) to negate FLPMA's repeal provision, section 703(a). The intervenors and non-federal defendants appear to offer such an interpretation. They suggest that once lands are segregated as part of a townsite, all individuals acquire a "valid land use right or authorization" to someday settle on those lands in compliance with the

*See id. But see Royal Harris*, 45 IBLA 87, 97 (1980) (Burski, ALJ, dissenting). However, since municipalities had a right, subject to preemption, under the townsite laws to all vacant, unsubdivided townsite lands from the time those lands were first segregated, FLPMA section 701(a) preserved municipalities' rights to all such lands to the extent that those rights existed on October 21, 1976. Allen Memorandum, *supra,* at 4. I conclude that the Secretary's interpretation of sections 701(a) and 703(a) is a reasonable reading of the two provisions, as well as being consistent with his 1972 interpretation of the term "valid existing rights" as it was used in ANCSA section 11(a)(1).

The Secretary's interpretation of sections 701(a) and 703(a) is also consistent with the purposes of FLPMA, and serves those purposes better than the interpretation of these provisions offered by the intervenors and non-federal defendants. Congress passed FLPMA in order to modernize and systematize the nation's public land laws, "weed out" those statutes relating to lands that were archaic and obsolete, and simplify the responsibilities of federal agencies in the field of public lands administration. *See* 43 U.S.C. § 1701(a)(10); H.R.Rep. No. 1163, 94th Cong., 2d Sess. 1–2, *reprinted in* 1976 U.S.Code Cong. & Ad.News 6175–76. Prior to FLPMA's passage, Congress specifically indicated that it considered the townsite laws to be "obsolete." *Id.* at 25, *reprinted at* 6199.

Under the Secretary's interpretation of § 701(a) and § 703(a), he no longer had authority to accord individuals any rights under the townsite laws that arose after October 21, 1976, and he was required either to convey the vacant, unsubdivided townsite lands in each village to its municipal corporation, or to hold them in trust until a municipal corporation could be es-

tablished. *See Royal Harris*, 45 IBLA at 88 (quoting letter of Townsite Trustee George Gustafson). Under either option, the Secretary and his subordinates would no longer be involved in townsite administration and application of the already-repealed townsite laws. In contrast, under the interpretation of these provisions offered by the intervenors and non-federal defendants, the Secretary and townsite trustee would continue administering existing townsites as if no repeal of the townsite laws had occurred. Clearly, the Secretary's interpretation is more consistent with FLPMA's objectives of simplifying and reducing the number of potentially conflicting public lands statutes in force, immediately eliminating those statutes that have become "obsolete," and reducing the burden and complexity of the Department of the Interior's responsibilities in lands administration.

Moreover, FLPMA's legislative history reveals that in repealing the townsite laws in 1976, Congress noted that these laws did not adequately provide for the needs of "[m]odern urban development," "land use planning, [or] protection of the public interest," but instead resulted in a "haphazard" placement and organization of towns. *See* H.R.Rep. No. 1163, 94th Cong., 2d Sess. 25, *reprinted in* 1976 U.S.Code Cong. & Ad. News 6199. Under the Secretary's interpretation of sections 701(a) and 703(a), municipalities would be free to use and develop vacant, unsubdivided townsite lands as they desired and to explore new and different land use planning strategies in order to achieve more orderly development. In contrast, the intervenors' interpretation would require townsite development in all villages to proceed in its conventional "haphazard" way, just as if FLPMA had never been enacted. Clearly, the Secretary's interpre-

townsite laws. *See also Royal Harris,* 45 IBLA 87, 97 (1980), (Burski, ALJ, dissenting). Under their interpretation, FLPMA's repeal of the townsite laws would essentially not affect the operation of the townsite laws in existing townsites. It would make FLPMA's savings provision apply across-the-board for existing townsites, as opposed to depending upon whether claimants had already established valid rights to

their particular parcels of land, and thus, it appears inconsistent with the language and structure of FLPMA section 701(a), as well as the underlying purposes of FLPMA as a whole. Moreover, if this interpretation of the term "valid land use right or authorization" were extended to the other laws repealed by FLPMA, none of these laws would have been effectively repealed.

tation coincides more fully with Congress' intent in FLPMA to promote modern land-use planning and to eliminate the random community growth that had been typical under the federal townsite laws.

The thrust of the intervenors' challenge to the Secretary's interpretation of FLPMA sections 701(a) and 703(a) is their claim that his interpretation would violate the terms of their townsite trusts, as well as violate the Secretary's and townsite trustee's fiduciary responsibilities to the trusts' beneficiaries.[32] According to the intervenors, although FLPMA repealed the townsite laws, it did not expressly revoke their existing townsite trusts. Therefore, their communities' "vested, beneficial rights" under those trusts remained intact. These included a right to have the townsite trustee continue administering their trusts until all their townsite lands had been subdivided, a right to have their individual members permitted to initiate claims on townsite lands after October 21, 1976, and a right to have the townsite trustee continue to issue both restricted and non-restricted deeds to those lands. If these rights are not preserved, the intervenors contend, then the purposes of their townsite trusts will not be effectuated.

I cannot agree with the intervenors' contentions, and I conclude that they are premised upon a misconception concerning the nature of the trusts established under the Alaska townsite laws. The intervenors appear to believe that because "trusts" were established for their villages, they are entitled to have their townsites administered as if no repeal of the townsite laws ever occurred. They seem to believe that their rights to have the townsite laws and regulations administered for their benefit are being preserved in trust for them, just as their lands are being preserved.

However, a careful examination of the townsite laws belies this interpretation. It reveals that trust protection extends only to the intervenors' *townsite lands,* not to any of the *benefits* provided to them under the townsite laws and regulations or to any of the *terms* under which their townsite trusts operate. The Townsite Act of March 3, 1891 provided that:

> *Until otherwise provided by Congress lands in Alaska may be entered for town-site purposes, for the several use and benefit of the occupants* of such town sites, by such Trustee or Trustees as may be named by the Secretary of the Interior for that purpose, such entries to be made under the provisions of section twenty-three hundred and eighty-seven of the [U.S.] Revised Statutes as near as may be; and *when such entries shall have been made the Secretary of the Interior shall provide by regulation for the proper execution of the trust in favor of the inhabitants of the town site, including the survey of the land into lots,* according to the spirit and intent of said section twenty-three hundred and eighty-seven of the Revised Statutes....

26 Stat. 1099, 43 U.S.C. § 732 (repealed 1976) (emphasis added).

Similarly, section 2387 of the U.S. Revised Statutes (1875), 43 U.S.C. § 718 (repealed), the leading townsite law upon which the 1891 Act was modeled and whose requirements were incorporated into the 1891 Act, provided that:

> Whenever any portion of the public lands have been or may be settled upon and occupied as a town-site ... it is lawful, in case such town be incorporated, for the corporate authorities thereof, and, if not incorporated, for the judge of the county court for the county in which such town is situated, *to enter at the proper land-office ... the land so settled and occupied in trust for the several use and benefit of the occupants thereof,* according to their respective interests; *the execution of which trust, as to the disposal*

---

**32.** The individual, non-federal defendants who are represented have fully adopted all the arguments of the intervenors concerning the effect of FLPMA on townsite administration in Alaska, and have indicated to this court that if it rules against the intervenors on this issue, it must also rule against them. Therefore, although the non-federal defendants have not specifically raised arguments concerning the rights of townsite trust beneficiaries, they have adopted these arguments by reference.

*of the lots in such town, and the proceeds of the sales thereof, to be conducted under such regulations as may be prescribed by the legislative authority of the State or Territory* in which the same may be situated.

U.S. Revised Statutes § 2387 (1875), 43 U.S.C. § 718 (repealed) (emphasis added).

Thus, the terms of the 1891 Alaska Townsite Act and section 2387 are essentially the same, except that the Secretary appointed townsite trustees in Alaska, as opposed to having local officials handle this responsibility, and the Secretary promulgated Alaska townsite regulations, as opposed to having state or territorial legislatures do so. When ANTA was enacted in 1926, it simply incorporated all the requirements of the 1891 Act, but also authorized townsite trustees to issue restricted deeds to native occupants of townsite lands. 44 Stat. 629–30, 43 U.S.C. §§ 733–736 (repealed 1976). Based upon my review of these three acts, I conclude that Congress' intent in the Alaska townsite laws was to provide that villages' *lands* could be placed "in trust for the several use and benefit of the[ir] occupants," but to reserve for itself and the Secretary the authority to modify the *terms* under which those trusts would operate. *See* U.S. Revised Statutes § 2387 (1875), 43 U.S.C. § 718 (repealed).

Congress' intent to reserve the power to modify the terms of townsite trusts for the Secretary is evidenced both by the language of the townsite acts and by the Secretary's consistent interpretation of them. In the 1891 Townsite Act, Congress directed the Secretary to promulgate "regulation[s] for the proper execution of the trust[s] in favor of [townsite] inhabitants," concerning such issues as the procedures

for survey, disposal, and sale of townsite lands, just as it had previously delegated that responsibility in section 2387 to the state and territorial legislatures. 26 Stat. 1099–1100, 43 U.S.C. § 732 (repealed 1976); U.S. Revised Statutes § 2387 (1877).

It is noteworthy that Congress directed the Secretary to issue "regulations" for the administration of Alaska's townsite trusts, rather than to draft individual trust instruments containing specific trust terms for each village.[33] In effect, the Secretary's regulations were to function as trust terms for all Alaskan townsites. This suggests first, that Congress intended the terms of all Alaskan townsite trusts to be uniform, and second, that Congress intended the Secretary to have the authority to modify these trust terms over time, just as he is authorized to modify his other regulations. The Secretary has consistently interpreted the Alaska townsite laws in both these ways: he has periodically amended his townsite regulations, and has always applied his amended regulations across the board—to already existing townsites, as well as to those not yet established.[34] *See* 43 C.F.R. §§ 2564–2565. Thus, based upon the language of the Alaska Townsite Acts and the consistent practice of the Secretary, I conclude that the Secretary was given authority under the Alaska townsite laws to modify the terms of established townsite trusts.

Moreover, Congress also reserved for itself power to alter the terms of established townsite trusts in Alaska. The opening words of the 1891 Townsite Act were: "[u]ntil otherwise ordered by Congress." This suggests that Congress intended to retain the power to negate or modify any actions taken or regulations promulgated

---

**33.** Assigning the Secretary to promulgate townsite regulations in the 1891 Act was consistent with Congress' approach in U.S. Revised Statutes section 2387, where it assigned such a responsibility to "the legislative authority of the State or Territory in which the [townsite was] situated." U.S. Revised Statutes § 2387 (1877). In delegating the responsibility to make townsite regulations to state and territorial legislatures, as in delegating such responsibilities to the Secretary for Alaska townsites, Congress appears to have contemplated that states would

adopt uniform regulations for all townsites, and would freely modify those regulations over time. *See* U.S. Revised Statutes § 2387 (1877).

**34.** Given the lack of written trust instruments listing the "terms" applicable to each townsite trust, it would be impractical and almost inconceivable for the Secretary to administer different villages' townsites according to different terms, depending upon when they were established and what townsite regulations were in effect at that time.

under the 1891 Act.[35] Furthermore, since under the 1891 Act all the terms of Alaska townsite trusts would be derived solely from federal statutes or regulations, it would have been logical for Congress to presume that it could always freely repeal or alter those terms through a subsequent enactment. Finally, on at least two occasions since 1891, subsequent Congresses have actually amended the terms of existing townsite trusts: in 1926, when Congress passed ANTA and authorized townsite trustees for the first time to issue restricted deeds to natives who were occupying lands in already existing townsites, and in 1948, when Congress authorized trustees to issue unrestricted deeds to natives in already existing townsites. *See* 44 Stat. 629, 43 U.S.C. §§ 733–736 (repealed 1976); 62 Stat. 35, 43 U.S.C. § 737. Thus, based on the text of the 1891 Act and the interpretation of that act suggested by at least two subsequent enactments by Congress, I conclude that Congress reserved for itself the power to alter the terms of existing townsite trusts.

It should be noted, however, that this power of Congress and the Secretary to alter the terms of townsite trusts is subject to certain limitations. For example, changes that effectively deprive individuals or entities of land to which they have already become entitled under the townsite laws or regulations might conceivably amount to a taking under the fifth amendment. Moreover, since ANTA was enacted

for the benefit of Alaska natives, any actions, especially by the Secretary, modifying the terms of townsite trusts in such a way that they could affect natives' rights or entitlements must satisfy "strict fiduciary standards." *Carlo v. Gustafson*, 512 F.Supp. 833, 838 (D.Alaska 1981).

In the present action, the intervenors claim that the Secretary's interpretation of FLPMA sections 701(a) and 703(a) will violate their rights under the terms of their townsite trusts, because it will deprive them of both the continued administration of their townsite lands by the townsite trustee, and the continued issuance of restricted and unrestricted deeds for their townsite lands. However, the Secretary's interpretation is completely consistent with his obligations under the terms of the intervenors' trusts and the Alaska Townsite Acts. The Secretary is not attempting to "revoke" the intervenors' trusts, as they suggest, in the sense of withdrawing lands from the possession of the trusts' beneficiaries. *See* Bogert & Bogert, *Handbook of the Law of Trusts* § 148, at 531 (5th ed. 1973) (defining trust revocation). On the contrary, under the Secretary's interpretation, all townsite lands currently held in trust would be immediately distributed to the trusts' beneficiaries. Thus, the beneficiaries, as a group, cannot argue that the Secretary's interpretation will result in a "taking" of their lands.[36] Their right to receive their townsite lands will be fully preserved.[37]

---

**35.** Arguably, this phrase in the 1891 Act may only apply to the Act's opening clause, which authorizes trustees to make entries of new townsites in Alaska. Thus, it may not reserve any broad power to Congress to alter the terms of already established townsite trusts. However, the phrase at least appears to support this interpretation, especially when viewed in light of the remainder of the 1891 Act, which reserved the power to amend the terms of townsite trusts for the Secretary, and in light of the fact that subsequent Congresses in 1926 and 1948 did amend the terms of existing trusts.

**36.** The intervenors contend that while, under the Secretary's interpretation, their villages will receive all the lands originally set aside for them, they are entitled to have the townsite trustee manage those lands and eventually distribute them to various village members. This

certainly does not rise to the level of a "taking" claim. Moreover, the non-federal defendants may argue that although they had not yet entered townsite lands in 1976, they were nevertheless potential future occupants at that time, and therefore were also "beneficiaries" of the townsite trusts who were entitled to an opportunity to make claims on those lands someday. This also is too tenuous to constitute a "taking" claim.

**37.** This court therefore need not resolve the issue of whether Congress reserved power to revoke townsite trusts completely after they had been established and to allocate their lands for other purposes. *See generally McCloskey v. Pacific Coast Co.*, 160 F. 794, 798 (9th Cir.1908) (asserting in general terms an "absolute right" of beneficiaries to townsite trust property, once entry of a townsite has been made). Such ac-

Under the Secretary's interpretation of sections 701(a) and 703(a), all that Congress intended to accomplish in FLPMA vis-a-vis Alaska's already existing townsites was to alter their trust terms and to establish an October 21, 1976 deadline for the initiation of any new townsite occupancies. This is consistent with Congress' intent in FLPMA to bring a halt to the "haphazard" development that resulted under the townsite laws and to encourage the introduction of modern land-use planning techniques. Therefore, under the Secretary's interpretation, Congress did not disturb existing townsite lands or valid claims predating October 21, 1976, but instead simply withdrew the Secretary's authority to recognize new claims after that date. Since Congress retained the power in the Alaska townsite acts to alter the terms of any townsite trusts, it was fully empowered to establish the October 21, 1976 deadline.

The Secretary's response to Congress' establishment of the October 21, 1976 deadline was logical and was authorized under the townsite laws. Since Congress had provided that no new townsite occupancies could be initiated after FLPMA's passage, the Secretary concluded that it would be pointless for him to wait until subdivisional surveys were approved before conveying any remaining townsite lands. Whoever had the controlling claim to a particular lot as of October 21, 1976 would ultimately prevail. Therefore, the Secretary has, in effect, directed the townsite trustee to no longer wait for subdivisional survey approval before conveying available townsite lands, and both the Secretary and trustee are prepared to convey these remaining lands based upon their status as of October 21, 1976. This policy on the part of the Secretary is consistent with Congress' purpose in FLPMA to remove the Secretary and his subordinates as soon as possible from townsite administration, and to the

extent that it constitutes a modification of the terms of any townsite trusts, the Secretary was fully authorized by Congress to make such modifications in the townsite acts. Thus, since adopting the Secretary's interpretation of FLPMA sections 701(a) and 703(a) would only effectively *amend* the terms of the intervenors' townsite trusts, and since both Congress and the Secretary are empowered under the townsite acts to make such amendments, I conclude that the Secretary's interpretation will not violate the intervenors' rights under their trusts.

Moreover, I conclude that the Secretary's interpretation does not violate his fiduciary responsibilities to the intervenors as Alaska native entities. *See Carlo,* 512 F.Supp. at 838. As noted above, the Secretary's interpretation fully preserves all trust lands for the intervenors and their village members. Furthermore, it will bring an end to haphazard settlement of the intervenors' villages, and will turn over large quantities of land to the intervenors' future municipal corporations, which will be able to employ modern land-use planning techniques. As discussed above, in the context of the plaintiffs' claims under ANCSA section 11(a)(1), conveying these lands to municipal corporations in the intervenors' villages may well create strong entities in those villages which will provide long-term benefits to the village members. Although the Secretary's interpretation will eliminate the availability of restricted deeds to members of the intervenors' villages, Congress may well have determined that these deeds are no longer necessary, or that their elimination has been more than compensated for by the other benefits of repealing the townsite laws.

Because I conclude that the Secretary's interpretation of FLPMA sections 701(a)

---

tion could, as noted above, possibly constitute a "taking" under certain circumstances, and might also exceed the power that Congress reserved for itself in the 1891 and 1926 Acts. In practical terms, however, Congress' power to amend the terms of Alaska's townsite trusts

might well also carry with it the power to revoke them. *See* Bogert & Bogert, *Handbook of the Law of Trusts* § 145, at 520 (5th Ed.1973), (power to amend terms of trust effectively includes power to revoke).

and 703(a) is reasonable, comports with FLPMA's purposes, and does not violate the terms of the intervenors' townsite trusts or the Secretary's fiduciary responsibility to the intervenors, I reject the intervenors' and non-federal defendants' challenges.

CONCLUSION

Since I reject the plaintiffs' claims based upon ANCSA section 11(a)(1) and other grounds, I grant summary judgment against the plaintiffs and in favor of the federal defendants and defendant Basil Atkinson, who began his townsite occupancy after the passage of ANCSA but prior to FLPMA's repeal of the townsite laws. Since I reject the claims of the intervenors and the non-federal defendants, other than Atkinson, that FLPMA's repeal of the townsite laws did not preclude individuals from initiating valid townsite occupancies after October 21, 1976, I grant summary judgment in favor of the federal defendants against the intervenors, and in favor of the plaintiffs against all non-federal defendants other than Basil Atkinson.

IT IS ORDERED THAT:

1. Summary judgment is granted in favor of the federal defendants against the plaintiffs and intervenors.

2. Summary judgment is granted in favor of defendant Basil Atkinson against the plaintiffs.

3. Summary judgment is granted in favor of the plaintiffs against all non-federal defendants other than Basil Atkinson.